USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1949 ABIODUN ABRAHAM and HENRY AJAO, Plaintiffs, Appellees, v. JOSEPH NAGLE, Defendant, Appellant. ____________________ No. 96-2008 ABIODUN ABRAHAM and HENRY AJAO, Plaintiffs, Appellants, v. JOSEPH NAGLE, ET AL., Defendants, Appellees. __________ PERRY ROY, ET AL., Defendants, Appellees. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Nancy J. Gertner, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Boudin and Lynch, Circuit Judges. ______________ ____________________ Susan M. Weise, Chief of Litigation, City of Boston Law _________________ Department, with whom Merita A. Hopkins, Corporation Counsel, was on _________________ brief for defendants. George C. Deptula, with whom George C. Deptula, P.C. was on __________________ _________________________ consolidated brief for plaintiffs. ____________________ June 9, 1997 ____________________ BOUDIN, Circuit Judge. Abiodun Abraham and Henry Ajao ______________ sued several police officers and the City of Boston for false arrest and for other alleged wrongs. During trial, the district judge directed a verdict in favor of Ajao on his false arrest claim against the defendant officer Joseph Nagle; the jury found in favor of the defendants on all other claims. Before us are cross-appeals by the plaintiffs and by Nagle. Our main concern is with the directed verdict and, for that purpose alone, we set forth the evidence in the light most favorable to Nagle. Fashion House, Inc. v. K mart _____________________ ______ Corp., 892 F.2d 1076, 1088 (1st Cir. 1989). On August 18, _____ 1990, at about 11 p.m., the plaintiffs, both black immigrants from Nigeria, arrived with three white women at the Venus de Milo nightclub in Boston. After waiting in line for several minutes, the group reached the club entrance. The three women were admitted, but the plaintiffs were not. The bouncer told Abraham that he could not enter the club because he was wearing jeans and because Abraham and Ajao were "a little intoxicated." The plaintiffs said that other people wearing jeans were being admitted and that the real reason for excluding them was their race. When Abraham continued to protest, a club employee summoned Nagle, a Boston police officer who was "on detail" at another establishment down the block. -2- -2- Nagle talked with the plaintiffs for 15 to 20 minutes, telling them that the club was not going to admit them and that they should leave; he says that the plaintiffs never told him of the alleged discrimination. During the discussion, Abraham became increasingly agitated, continued to protest loudly, and at one point hit or pushed Nagle in the chest. Nagle then arrested Abraham for assault and battery on a police officer. Nagle sought to handcuff Abraham but the latter struggled free. Nagle radioed for help and was soon joined by officer Thomas Boyle. Together, Nagle and Boyle handcuffed Abraham and tried to bring him to Boyle's cruiser, which was double-parked in the street. Abraham resisted by going limp. As Nagle and Boyle sought to move Abraham to the car, Ajao circled the officers and yelled, "why are you doing this to my friend," "this isn't South Africa, you're white racist cops." According to Boyle, Ajao was "trying to prevent us from getting to the police car." At one point Boyle said that he "had to actually push [Ajao] out of my way" as the officers wrestled with Abraham. Several times the officers told Ajao to "get away." Eventually, with Ajao still present, the officers pushed Abraham into the back seat of the car; he then prevented the door from closing by kicking at it, but -3- -3- the officers forced it closed. By this time a crowd of 20 or so had gathered to watch. In the meantime, as Abraham continued to yell from the cruiser, Ajao circled it and came up behind the left rear quarter of the car. Ajao was told: "Police, leave, get away from the cruiser"; Nagle later testified that he had feared that Ajao might try to open the car door and release Abraham. Ajao failed to move. Nagle then arrested Ajao, who in turn struggled with Nagle, Boyle and a third officer, once kicking Nagle in the mid-section, before being restrained. In due course, Abraham and Ajao were both charged with assault and battery and disorderly conduct. Mass. Gen. Laws ch. 265, 13D; id. ch. 272, 53. They were tried in state ___ court in November 1990 and acquitted. In February 1993, they in turn brought suit in state court against Nagle and other police officers, and the city, charging the defendants with false arrest under 42 U.S.C. 1983 and state law and with various other wrongs.1 The defendants removed the action to federal court and, following discovery, trial began in March 1995. After all of the evidence was taken, the district court granted Ajao's motion for a directed verdict in his favor  ____________________ 1The other claims, some of which were dropped prior to or during trial, charged the defendants with false imprisonment, racial discrimination, violation of free speech rights, assault and battery, and use of excessive force. -4- -4- against Nagle, see Fed. R. Civ. P. 50(a); in an oral ruling, ___ the trial judge declared that Nagle was liable under both federal and state law for falsely arresting Ajao in violation of the latter's First and Fourth Amendment rights. The court's primary rationale, as we read the transcript, was that (in the district judge's view) Ajao's conduct prior to his arrest did not "rise to the level of disorderly conduct . . . ." The balance of the case was submitted to the jury. By responses to special interrogatories, the jury fixed Ajao's damages at $8,500 to vindicate his "rights against false arrest," but made no separate award for violation of free speech rights. On all of the plaintiffs' remaining claims, the jury found against the plaintiffs and in favor of the defendants. Thereafter, the district court awarded Ajao attorney's fees of $24,858.50. Nagle now appeals from the directed verdict against him. The plaintiffs also appeal, urging that they are entitled to a new trial on their unsuccessful claims, to an injunction, and to increased attorney's fees. We begin with Nagle's appeal. On review of a directed verdict, we take the evidence most favorably to the losing party and ask de novo whether a _______ reasonable jury had inevitably to decide in favor of the victor. Smith v. F.W. Morse & Co., 76 F.3d 413, 425 (1st _____ _________________ Cir. 1996). Here, putting aside some loose ends, the central question is whether Nagle at the time of the arrest had -5- -5- probable cause to believe that Ajao had committed the offense of disorderly conduct. If so, this largely defeats the false arrest claim under both federal and state law. Logue v. _____ Dore, 103 F.3d 1040, 1044 (1st Cir. 1997); see Commonwealth ____ ___ ____________ v. Grise, 496 N.E.2d 162, 163 (Mass. 1986). _____ Of course, it would be much easier to conclude that Nagle, on his own version of events, had probable cause to charge Ajao with assault and battery: Nagle said that Ajao kicked him. But the kick occurred after Ajao's arrest; prior _____ to the arrest, the only pertinent charge was disorderly conduct. We reserve for another day various issues that would arise if the original arrest were unjustified but resistance to it provided grounds for a valid charge. Compare Groman v. Township of Manalapan, 47 F.3d 628, 635 (3d _______ ______ _____________________ Cir. 1995), with United States v. Dawdy, 46 F.3d 1427, 1430- ____ _____________ _____ 31 (8th Cir.), cert. denied, 116 S. Ct. 195 (1995). ____________ In defining disorderly conduct, Mass. Gen. Laws ch. 272, 53 provides for the punishment, inter alia, of "idle and __________ disorderly persons." In 1967, the Supreme Judicial Court rejected a challenge that this provision was unconstitutionally vague by interpreting it to incorporate the Model Penal Code's definition of disorderly conduct. Alegata v. Commonwealth, 231 N.E.2d 201, 211 (Mass. 1967). _______ ____________ That definition states: A person is guilty of disorderly conduct if, with purpose to cause public inconvenience, annoyance or -6- -6- alarm, or recklessly creating a risk thereof, he: (a) engages in fighting or threatening, or in violent or tumultuous behavior; or (b) makes unreasonable noise or offensively coarse utterance, gesture or display, or addresses abusive language to any person present, or (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor. Id. (quoting ALI, Model Penal Code 250.2 (Proposed Official ___ _________________ Draft 1962)). Several years later, the Supreme Judicial Court struck down subsection (b) of this definition as unconstitutionally overbroad. Commonwealth v. A Juvenile, 334 N.E.2d 617, 622 ____________ __________ (Mass. 1975). And to avoid First Amendment concerns, the court ruled that the remaining subsections (a) and (c) must be construed to cover only conduct, not activities which involve the "lawful exercise of a First Amendment right." Id. at 628; see ___ ___ also Commonwealth v. LePore, 666 N.E.2d 152, 155 (Mass. App. Ct.) ____ ____________ ______ ("To be disorderly within the sense of the statute, the conduct must disturb through acts other than speech . . . ."), review ______ denied, 668 N.E.2d 356 (Mass. 1996). ______ Nagle testified that he arrested Ajao under subsection (c), not subsection (a), and we doubt that Ajao's conduct prior _____ to his arrest would support a charge under subsection (a). Thus, the question for us is whether a reasonable jury could have found that Nagle had probable cause to believe that Ajao had violated subsection (c) by "creat[ing] a hazardous . . . condition by any act which serves no legitimate purpose of the actor." We think -7- -7- that a reasonable jury, if it accepted the defense version of events, could have so found. An arrest of a struggling defendant--here, Abraham--is a serious business. Even without a gathering crowd and traffic blocked by a police cruiser, there is a potential for serious violence and of injury both to the suspect and to the police. Yet, assuming the truth of the defense evidence, Ajao--despite repeated requests to get out of the way--circled the officers while shouting, at least once got directly in their way, and then refused to move away from the cruiser. Such behavior can fairly be taken to fall directly within the literal language of subsection (c): creating "a hazardous . . . condition" by acts "which serve[] no legitimate purpose of the actor." Indeed, a number of Massachusetts cases have upheld disorderly conduct arrests where a refusal to obey police orders created a safety threat. See Commonwealth v. Mulero, 650 N.E.2d ___ ____________ ______ 360, 363 (Mass. App. Ct.), review denied, 652 N.E.2d 145 (Mass. _____________ 1995); Commonwealth v. Bosk, 556 N.E.2d 1055, 1058 (Mass. App. ____________ ____ Ct. 1990); Commonwealth v. Carson, 411 N.E.2d 1337, 1338 (Mass. ____________ ______ App. Ct. 1980).  Literal language is not the full story. The state's highest court has glossed the statute not to apply wherever the activities are themselves the "lawful exercise of a First Amendment right." A Juvenile, 334 N.E.2d at 628. And Ajao had a __________ free-speech right to protest the arrest of his companion, even if -8- -8- this distressed or annoyed the police. But by the same token, "the mere fact that the conduct of the defendant was accompanied by speech does not preclude a conviction" under the disorderly conduct law. Carson, 411 N.E.2d at 1337.  ______ We have very little difficulty in separating Ajao's protected speech from his physical interference with two policemen struggling to arrest and detain a third person, which is not protected. Indeed, in Colten v. Kentucky, 407 U.S. 104, ______ ________ 109 (1972), the Supreme Court upheld a conviction for far less disruptive conduct, observing that "Colten's conduct in refusing to move on after being directed to do so" was not protect by the First Amendment. See also City of Houston v. Hill, 482 U.S. 451, ________ _______________ ____ 463 n.11 (1987). In some cases, peaceful demonstration and protected expression may appear to merge. Possibly, this may explain Commonwealth v. Feigenbaum, 536 N.E.2d 325, 328 (Mass. 1989), ____________ __________ where the state court held that the disorderly conduct statute did not extend to the blocking of traffic in the course of a peaceful political rally because the defendant's purpose was legitimate. But Ajao's alleged conduct in the present case-- disrupting a police attempt to arrest a struggling companion-- seems to us both more dangerous and less legitimate. -9- -9- Further, even if Feigenbaum were given its most extreme __________ reading,2 making a good purpose a complete defense, it would be up to a jury to determine whether Ajao was acting to express protected speech or whether he also sought to interfere with the arrest. The latter aim could not be a legitimate purpose on any view of the matter. Yet a jury could infer, assuming it accepted the defense version of events, that Ajao was trying to frustrate the arrest by getting in the way or distracting the officers and not simply trying to convey his objections. In this case, the jury certainly did not have to accept the police version of the events. The plaintiffs gave a more benign account of their conduct and there were some contradictions in the defendants' own testimony. But it was the jury's province, after observing Nagle, the other officers, and the plaintiffs on the witness stand to decide whom the jurors believed. We simply disagree with the trial judge's conclusion that she was free to make that credibility determination. If the district judge thought that the credibility issues fell within her province, this was a mistaken view of the governing rule. See Smith, 76 F.3d at 425.3 ___ _____  ____________________ 2At least two state court decisions after Feigenbaum __________ suggest that an extreme reading is unwarranted and that a defendant can be liable for disorderly conduct even where his main objective is to protest police decisions. See Mulero, ___ ______ 650 N.E.2d at 363; Bosk, 556 N.E.2d at 1058. ____ 3Nagle points to the trial judge's comment (made in discussing jury instructions) that "I am basing my findings with respect to Mr. Ajao on my evaluations of the credibility -10- -10- Three loose ends remain. One is the possibility that an arrest based on probable cause might still be unlawful if the police officer acted simply for the purpose of punishing protected speech. There is some law on this subject, compare _______ Whren v. United States, 116 S. Ct. 1769, 1774 (1996), with Sloman _____ _____________ ____ ______ v. Tadlock, 21 F.3d 1462, 1469 (9th Cir. 1994), but we need not _______ pursue the issue here. Plaintiffs have not pointed to any direct evidence that Nagle acted out of an improper motive to suppress speech, and certainly nothing would remotely justify deciding that issue against him by a directed verdict. The second is the possibility, on remand, of a qualified immunity defense for Nagle. This defense, preserved in the district court, has been successfully invoked in this circuit where a police officer made a reasonable, if arguably mistaken, call on a close legal issue. E.g., Joyce v. Town of Tewksbury, ____ _____ _________________ 112 F.3d 19 (1st Cir. 1997); Veilleux v. Perschau, 101 F.3d 1, 3 ________ ________ (1st Cir. 1996). We have ignored the issue here only because the city has chosen, for reasons not explained, to fight this appeal on the merits. Third, for the sake of completeness, we note that in 1995- -well after the incident in this case--Massachusetts enacted a separate "resisting arrest" statute that also covers situations in which the person charged prevented or attempted to prevent the  ____________________ of the witnesses as well as my evaluations of the sufficiency of the evidence . . . ."  -11- -11- arrest of another. Mass. Gen. Laws ch. 268, 32B. We need not consider whether Ajao could have been charged under this statute, which is narrower in focus but more severe in penalties than the disorderly conduct statute applied here. There is no indication that the adoption of the new statute was meant to eliminate or alter the availability of the disorderly conduct law as a less severe remedy for addressing disorderly interference with police activity. Turning now to the plaintiffs' appeal, we begin with their claim that the district court erred in denying them a new trial on their other claims which were rejected by the jury. The arguments are largely conventional ones turning on the weight of the evidence, the propriety of closing arguments, and possible confusion on the part of the jury evidenced by an inquiry made by the jury during its deliberations. The denial of a new trial motion under Fed R. Civ. P. 59 is reviewed for abuse of discretion. Bogosian v. Mercedes-Benz ________ _____________ of North America, Inc., 104 F.3d 472, 482 (1st Cir. 1997). __ ____________________ Without describing the plaintiffs' arguments in detail, we find no abuse here in rejecting each of the new-trial grounds thus far mentioned. A potentially more serious claim is that the jury pool may have excluded minorities, but the plaintiffs have pointed to nothing in the record to support the charge or to show that it was even raised in the trial court. -12- -12- The plaintiffs also object to the district court's failure to grant injunctive relief. The relief sought was to prevent the Boston police from continuing to use, at least without revision, a training bulletin that sets forth the Model Penal Code definition of disorderly conduct but fails to indicate that subsection (b) has been struck down by the Supreme Judicial Court. The city, which has not responded on this point, would be well advised to clarify the manual on its own. But the plaintiffs were not charged under subsection (b); in fact, Nagle testified that he had been taught that subsection (b) had been held invalid. Nor did the plaintiffs show that they faced any real threat of future injury, e.g., by threats to ____ enforce subsection (b) against them in the future. City of Los ____________ Angeles v. Lyons, 461 U.S. 95, 102 (1983). The district court, _______ _____ exercising its equitable authority to grant or deny injunctive relief, certainly did not have to grant any here. To conclude, we vacate the judgment against Nagle on the ______ false arrest claim and the now-mooted award of attorney's fees against him and otherwise affirm the judgment entered on the jury ______ verdicts in favor of the defendants. The false arrest claim is remanded for further proceedings consistent with this opinion. ________ It is so ordered. _________________ -13- -13-