132 F.3d 97
 Nylsa ACOSTA-OROZCO, et al., Plaintiffs, Appellants,
v.
Carmen RODRIGUEZ-DE-RIVERA, et al., Defendants, Appellees.
 No. 97-1489.
 United States Court of Appeals,
First Circuit.
 Heard Nov. 5, 1997.
Decided Dec. 22, 1997.
 
 Manuel Alvarado, San Juan, PR, for appellants.
 Roxanna Badillo-Rodriguez, Assistant Solicitor General, Commonwealth of Puerto Rico, Catano, PR, with whom Carlos Lugo-Fiol, Solicitor General of the Commonwealth of Puerto Rico, San Juan, PR, and Edda Serrano-Blasini, Deputy Solicitor General, Guaynabo, PR, were on brief, for appellees.
 Before TORRUELLA, Chief Judge, CYR, Senior Circuit Judge, and LYNCH, Circuit Judge.
 LYNCH, Circuit Judge.
 
 
 1
 This is another in a series of cases following the assumption of power by the New Progressive Party (NPP) in Puerto Rico in elections held in November 1992. In these cases, plaintiffs are government employees who are members of the losing Popular Democratic Party (PDP) who assert that they were terminated or demoted from their jobs because of their political affiliation.[1] This court faced an earlier wave of such cases when PDP candidates won election in 1984 and NPP members complained that their government jobs suffered because of their party membership.
 
 
 2
 In this case, the PDP-affiliated plaintiffs are six long-term government employees who were demoted from their civil service positions as Managerial Coordinators in the Commonwealth's Department of Social Services, now known as the Department of the Family. They say their duties are now being performed by NPP members who have been designated as aides to the Regional Directors of the agency. The district court granted summary judgment for defendants on the theory that plaintiffs had not made out a prima facie case and that defendants had established they would have taken action anyway for non-political reasons, regardless of plaintiffs' political affiliation. Because we believe there are material facts in dispute, we reverse and remand.
 
 I.
 
 3
 Our review of the district court's grant of summary judgment is de novo. Sears, Roebuck & Co. v. Goldstone & Sudalter, P.C., 128 F.3d 10, 15 (1st Cir.1997). We state the facts in the light most favorable to the party opposing summary judgment. See id. at 12.
 
 
 4
 Plaintiffs are six career civil service employees of the former Department of Social Services of Puerto Rico, now known as the Department of the Family, all of whom have been working at the Department for over twenty years. All plaintiffs belong to the PDP, the party of former Governor Rafael Hernandez Colon, who held office for two terms between 1984 and 1992. In a process that began in late 1987, a new supervisory position of "Managerial Coordinator" was created within the Department. Between 1988 and 1992, the six plaintiffs and several others were promoted to this new position.
 
 
 5
 The Managerial Coordinator classification was a middle level managerial position created to provide assistance to the several Regional Directors. The Regional Directors, in turn, report to the Secretary, a member of the Governor's cabinet. The Managerial Coordinator job was established as a career position under Puerto Rico's civil service laws, which require that such an employee be selected strictly on merit and can only be removed for cause. See 3 L.P.R.A. §§ 1301, 1331-1338; Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1213 n. 3 (1st Cir.1989) (en banc). The Regional Directors, in contrast, were classified as "confidential employees," who are involved in the formation of public policy and render direct services to the head of the department, the Secretary of Social Services. See 3 L.P.R.A. § 1350; Agosto-de-Feliciano, 889 F.2d at 1213 n. 3. The Central Office of Personnel Administration (COPA), the agency charged with administering Puerto Rico's civil service laws, approved the creation of the Managerial Coordinator position. In approving the position, the civil service agency necessarily concluded that political affiliation was not a necessary prerequisite for holding a Managerial Coordinator position.
 
 
 6
 The Director of COPA described the position generally, in a job description written in 1988, as entailing "managerial and administrative work of great complexity and responsibility in the coordination and evaluation of the ... activities of the Local Offices...." Plaintiffs' immediate superiors were the Regional Directors. On paper, according to the COPA job description, the official duties of a Managerial Coordinator included offering technical advice on the agency's work plans, keeping the Regional Directors and the Secretary informed of local office operations, investigating and reporting on grievances of employees, monitoring local offices' expenses, training local office supervisors, analyzing statistical reports, preparing reports about evaluation visits to local offices, and other duties. In practice, plaintiffs' duties as Managerial Coordinators ranged widely, and included coordinating inter-agency programs, attending to client complaints, substituting for the Regional Director, planning professional and social activities, and signing per diem and mileage reimbursement checks. Plaintiffs' positions "provid[ed] support functions to the Regional Directors, analogous to those of an aide."
 
 
 7
 In the 1992 general election, the PDP was defeated by the rival NPP, and the present governor, Pedro Rosello, came to power. Governor Rosello named defendant Carmen Rodriguez-de-Rivera as Secretary of Social Services. Rodriguez-de-Rivera, in turn, hired the Regional Directors. In the first month of the new administration, the Regional Directors began to take away many of the duties and functions that the Managerial Coordinators had been performing, assigning those duties to other employees who were NPP activists and had been designated, officially or unofficially, as aides to the Regional Directors. Additionally, the Regional Directors took away from the Managerial Coordinators several perquisites that had been associated with that position, such as parking, telephones and office space. Defendants were aware of plaintiffs' PDP political party affiliation, and the aides to whom plaintiffs' duties were assigned were all politically active supporters of the NPP party, newly in power.
 
 
 8
 In February 1993, one Managerial Coordinator wrote defendant Rodriguez-de-Rivera, to complain that the new Regional Directors had taken away the duties and perquisites of her position. Rodriguez-de-Rivera's reaction was to launch an investigation of the complainant and the other Managerial Coordinators. The stated purpose of the investigation was to determine whether the creation of the position and the selection of candidates had been proper. Plaintiffs contend that the real purpose of the investigation was to provide a legal cover for the impending demotions.
 
 
 9
 In May 1993, Secretary Rodriguez-de-Rivera dispatched Carmen Salivia, an official of the Social Services Department, to conduct field interviews with the Managerial Coordinators. During the interviews, the Managerial Coordinators described the duties of their positions--now being performed by NPP-affiliated aides--and said they reported to the Regional Directors. Salivia completed the interviews and delivered her notes to defendant Enrique Gonzalez-Polanco, Assistant Secretary in Charge of Personnel, or to Mrs. Carmen Haddock, who worked in the office. Salivia drew no conclusions and her investigation was terminated when she went on vacation.
 
 
 10
 Rodriguez-de-Rivera also hired Francisco Cappas, an outside personnel consultant, to review the matter. Although Salivia understood that her notes would be used in the Cappas investigation, the interview notes were never given to Cappas before he completed his reports. Cappas apparently held no position within the government.
 
 
 11
 In June 1993, Cappas submitted two letter reports to Rodriguez-de-Rivera. In the first, he concluded that the position of Managerial Coordinator should be declared a legal nullity because it had been improperly created and was duplicative of the duties of the Regional Directors. Specifically, he concluded that the Managerial Coordinators were in reality policymaking officials who reported directly to the Secretary, not to the Regional Directors, and that the position should therefore have been classified as "confidential" rather than as a career civil service post. Under Puerto Rico law, "confidential employees" are only those employees who report directly to the head of the agency. See 3 L.P.R.A. § 1350 (aides to the heads of departments, but not aides to regional directors, included in list of confidential employees). These conclusions are facially contrary to the determination made by COPA, the civil service agency, when it approved the creation of the positions.[2]
 
 
 12
 In his second report, Cappas concluded that many of the Managerial Coordinators had been improperly promoted, even though COPA had approved many of these promotions at the time. Cappas recommended that the Managerial Coordinators be given a hearing and--if they could not counter his initial assessment--that they be demoted to their previous positions.
 
 
 13
 In December 1993, Rodriguez-de-Rivera asked the Secretary of Justice of Puerto Rico for an opinion on the legality of the Managerial Coordinators' appointments, repeating the allegations of the Cappas reports. In May 1994, the Secretary of Justice declined to give an opinion, noting that the legality of the Managerial Coordinators' appointments depended on the factual accuracy of those allegations, not on any question of law, and referred that issue to COPA, whose special expertise is the administration of Puerto Rico's civil service laws.
 
 
 14
 Rodriguez-de-Rivera then requested the Director of COPA and the Director of the Budget and Management Office (BMO) to determine that the position of Managerial Coordinator was a nullity, sending a copy of her letters to Governor Rosello and his staff. The COPA director responded by disputing several of the claims contained in the Cappas reports, and by refusing to nullify the position or promotions of the Managerial Coordinators.
 
 
 15
 In contrast with the civil service agency, the BMO director responded by stating that he could find no document authorizing budgetary approval for the position, and drew the inference that the position was therefore illegally created.[3]
 
 
 16
 In spite of the COPA opinion, on August 9, 1994, Rodriguez-de-Rivera issued an administrative order providing "[t]hat all positions classified as Managerial Coordinators in the Department are null." Plaintiffs were not afforded an administrative hearing prior to this declaration, or given an opportunity to dispute the allegations contained in the Cappas reports, although this had been recommended by Cappas. Each of the plaintiffs was thereafter demoted to the positions they had previously held within the agency. As a result of the nullification order, each of the plaintiffs suffered a loss of salary in addition to making permanent and official their previous de facto loss of position.
 
 
 17
 Plaintiffs say that their significant job functions have been assumed by other persons, all NPP members, all in the position of aides to the Regional Directors. It is our understanding that aides to persons at the level of regional directors cannot be classified as "confidential" (or political) employees within the Puerto Rico personnel system. See 3 L.P.R.A. § 1350.
 
 II.
 
 18
 In November 1994, plaintiffs filed suit, alleging violations of their First Amendment rights of political affiliation under Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) and Rutan v. Republican Party of Ill., 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Plaintiffs also alleged that they were deprived of a property interest without due process of law, and that their demotions violated the constitution and statutes of the Commonwealth of Puerto Rico. On January 27, 1997, the district court granted summary judgment for defendants, finding that plaintiffs had not shown a causal connection between their demotions and their political affiliation. The district court also reasoned that defendants' stated rationale for the demotions--departmental efficiency and respect for the personnel laws--was sufficient to compel a finding that defendants had a defense under Mount Healthy City Sch. Dist. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), even if political affiliation had played some part in their decision.III.
 
 
 19
 Plaintiffs have produced evidence sufficient to support a prima facie case of political party discrimination. The First Amendment prohibits the government from demoting an employee for patronage purposes unless political party affiliation is an appropriate requirement for that position. See Rutan, 497 U.S. at 64, 110 S.Ct. at 2731-32; Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 705 (1st Cir.1993). A plaintiff who was demoted from a job for which a party affiliation requirement is inappropriate "may ordinarily forestall summary judgment by pointing to evidence in the record which, if credited, would permit a rational factfinder to conclude that a demotion occurred and that it stemmed from a discriminatory animus." Nereida-Gonzalez, 990 F.2d at 706.
 
 
 20
 There is no dispute that plaintiffs were demoted; the "nullity" decree[4] eliminated their supervisory positions altogether and returned them to the jobs they held previously, which are of lower rank and salary. As the subjects of demotion, "which involve reductions in pay and official rank," Agosto-de-Feliciano, 889 F.2d at 1218 n. 8, plaintiffs plainly need not establish that their new "work situation [is] unreasonably inferior to the norm for the position" such that "the new work conditions would place substantial pressure on even one of thick skin to conform to the prevailing political view." Id. at 1218.[5]
 
 
 21
 Viewed in the light most favorable to the plaintiffs, the summary judgment record amply demonstrates that a rational factfinder could conclude that the demotions stemmed from a discriminatory animus. In this case, it was uncontested for summary judgment purposes that the plaintiffs were all members of the adverse party, that their superiors knew this, and that their duties were given to active supporters of the party in power. Of course, the Supreme Court has cautioned that the mere fact that an adverse action was taken after an employee exercises First Amendment rights is not enough by itself to establish a prima facie case. See Board of County Comm'rs v. Umbehr, 518 U.S. 668, ----, 116 S.Ct. 2342, 2352, 135 L.Ed.2d 843 (1996). "Merely juxtaposing a protected characteristic--someone else's politics--with the fact plaintiff was treated unfairly is not enough to state a constitutional claim." Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 58 (1st Cir.1990) (citation omitted).
 
 
 22
 Nevertheless, a plaintiff need not produce direct evidence of discriminatory treatment (a so-called "smoking gun") to establish a prima facie case of politically discriminatory demotion. We have reversed entry of summary judgment in favor of defendants in cases where plaintiffs have produced sufficient evidence of a discriminatory animus through circumstantial evidence. See, e.g., Rivera-Ruiz v. Gonzalez-Rivera, 983 F.2d 332, 335 (1st Cir.1993); Rodriguez-Pinto v. Tirado-Delgado, 982 F.2d 34, 39-40 (1st Cir.1993); Aponte-Santiago v. Lopez-Rivera, 957 F.2d 40, 43 (1st Cir.1992). In Anthony v. Sundlun, 952 F.2d 603 (1st Cir.1991), this court noted:
 
 
 23
 [T]he appellants' argument seems to be that political favoritism must be proved by direct evidence. We disagree. Victims of heavy-handed uses of the spoils system are not limited to redress in only those (relatively rare) instances in which a "smoking gun" can be produced. To the exact contrary, we have held, time and again, that circumstantial evidence alone can support a finding of political discrimination.
 
 
 24
 Id. at 605 (citing cases).
 
 
 25
 In this case, plaintiffs presented much more than the mere fact that they were demoted by supervisors of a different party. First, the reason given for the supposed nullity of the Managerial Coordinators' appointments was that their positions were improperly classified as civil service rather than "confidential" positions. This suggests that defendants believed it was appropriate to take political party affiliation into account in deciding to eliminate the Managerial Coordinators and transfer their duties to the new aides to the Regional Directors. Indeed, that is exactly what plaintiffs say happened: their duties were transferred to NPP members. This happened although a jury could readily find the position was appropriately classified as a civil service position.
 
 
 26
 Second, a reasonable jury could find Rodriguez-de-Rivera's reaction to the initial complaint from a PDP member that her rights under the civil service laws were being violated--to launch an investigation of the complainant--to be evidence of political discrimination.
 
 
 27
 Third, the conduct of that investigation, including the failure to apprise Cappas of the Managerial Coordinators' statements that they reported to the Regional Directors, could support a reasonable inference that it was not conducted fairly, but rather was simply intended to provide a legal pretext for a foreordained decision to demote the plaintiffs.
 
 
 28
 Fourth, the failure to afford plaintiffs a hearing to contest the allegations concerning the alleged "nullity" of their appointments and promotions could likewise fairly imply that the Department was uninterested in the truth of the controversy.
 
 
 29
 Finally, Rodriguez-de-Rivera's disagreement with the advice of COPA, Puerto Rico's civil service commission, casts serious doubt on the supposed "nullity" of the plaintiffs' appointments or promotions and an inference could be drawn that her decision was in fact motivated by an unlawful patronage objective.
 
 IV.
 
 30
 The district court did not rest its decision entirely on its view of plaintiffs' prima facie case, however, but decided that defendants had established that they would have taken the same action regardless of plaintiffs' political affiliation for what it considered "credible policy reasons" of departmental efficiency. This, the district court reasoned, established a valid defense under Mount Healthy. The district court noted what it considered "a logical inconsistency" in plaintiffs' claims of political discrimination. Observing that the record was unclear whether every Managerial Coordinator was a member of the PDP, the district court reasoned that political diversity among the Managerial Coordinators undercut plaintiffs' claims of political discrimination.[6] The district court added that, alternatively, if the positions were filled exclusively with PDP members, that "would indicate that the position served some political purpose, and was thus a 'de confianza,' or trust position," as the Cappas report had claimed.
 
 
 31
 The burden of persuasion is on the Secretary to establish a Mount Healthy defense. "Summary judgment would have been warranted ... only if defendants' evidentiary proffer compelled the finding that political discrimination did not constitute a 'but for' cause for the demotion." Jirau-Bernal v. Agrait, 37 F.3d 1, 4 (1st Cir.1994). Here, there are significant disputes of material fact which preclude a finding on summary judgment for defendants.
 
 
 32
 Defendants' evidence that their decision was motivated by a concern for departmental efficiency that would have resulted in the same personnel action regardless of plaintiffs' political affiliation is both disputed and far from conclusive. First, Cappas's finding that the existence of the Managerial Coordinators interrupted the free flow of the agency hierarchy was based on a view that plaintiffs reported to the Secretary, not to her subordinates, the Regional Directors. Plaintiffs have successfully put this conclusion into doubt through their sworn statements to the contrary. Second, plaintiffs, in their affidavits, say that their duties and responsibilities have been transferred to new aides to the Regional Directors associated with the NPP. If this is true, it calls into question the Department's "efficiency" rationale, as the addition of new aides undercuts any argument that the positions were eliminated to save departmental resources.
 
 
 33
 Of course, defendants' contention that plaintiffs' demotions were the result of a valid concern for departmental efficiency and regularity--even if political discrimination was a "substantial factor" in the decision--is a viable defense at trial. To establish that defense, defendants must show that the allegedly bona fide reasons underlying the demotions were sufficient by themselves to justify the decisions. After Rutan, it is clear that if defendants thought that plaintiffs' political beliefs alone would prevent them from carrying out the department's policy, that is not an acceptable reason for the demotions. "A government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high-level employees on the basis of their political views." Rutan, 497 U.S. at 74, 110 S.Ct. at 2738 (citations omitted).[7] On the other hand, if defendants can establish that plaintiffs opposed departmental policy and that they actively attempted in fact to thwart it, that could be sufficient to establish a Mount Healthy defense. See Rutan, 497 U.S. at 74, 110 S.Ct. at 2737 ("A government's interest in securing effective employees can be met by discharging, demoting or transferring staff members whose work is deficient.").
 
 
 34
 There appears to be lurking in the wings of this case, but not on stage, a suggestion by the defendants that if the plaintiffs were removed for political reasons, and if their duties continued and were assigned to NPP members, that those duties nevertheless fall within the Elrod-Branti exception because those duties are sensitive enough to make a political affiliation requirement appropriate. However, defendants did not raise the Elrod-Branti exception issue in their responsive pleading or in their motion for summary judgment. The district court mentioned the Elrod-Branti exception despite the defendants' failure to articulate it, but did not resolve the issue. Rather, the district court rested its decision on its view that plaintiffs had not established a prima facie case. The issue has not been fairly briefed on appeal. This court does not decide issues on appeal that have not been properly raised before the district court. See McAleer v. Smith, 57 F.3d 109, 115 (1st Cir.1995). Although the issue of the Elrod-Branti exception is somewhat related to the Secretary's contention that the positions were illegally created in part because they should have been classified as "confidential" positions under Puerto Rico law, it is by no means the same argument. See Roldan-Plumey, 115 F.3d at 64-65 (rejecting government's claim that political affiliation requirement is permitted despite Puerto Rico's classification of position as "confidential.").
 
 
 35
 Until the contours of the case are clear, we are reluctant, as we have been invited to do, to engage in further analysis of the effects of Rutan on the so-called "changeover" or "reorganization" defense as outlined in Agosto-de-Feliciano, 889 F.2d at 1220-22.
 
 
 36
 Finally, we note that, if plaintiffs were originally classified appropriately as career civil service employees, their claims under the Due Process Clause and under the constitution and laws of Puerto Rico survive independently of their First Amendment claim. If plaintiffs reported to the Regional Directors, as they claim, they were apparently classified appropriately as career employees and are therefore protected against political discharge under the civil service laws of Puerto Rico. See 3 L.P.R.A. §§ 1301, 1331-1338. The Puerto Rico legislature may, of course, establish a civil service system that provides greater protection against political discrimination than the First Amendment. Plaintiffs may have claims under the Constitution of Puerto Rico as well. Cf. Jimenez Fuentes, 807 F.2d at 249-250 (Torruella, J., dissenting) (noting that Supreme Court of Puerto Rico grants broad protection against political discrimination, perhaps broader than this circuit's interpretation of the First Amendment); Raffucci-Alvarado, 816 F.2d at 822-23 (Torruella, J., dissenting) (same).
 
 
 37
 Likewise, because of plaintiffs' tenured status under Puerto Rico law, their summary demotions could raise a claim under the Due Process Clause if their appointments were proper. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (guaranteeing procedural protections to public employees with a property interest in continued employment under state law); Rivera-Ruiz v. Gonzalez-Rivera, 983 F.2d 332, 334 (1st Cir.1993) (noting that, under Puerto Rico law, the existence of a property right in continued public sector employment is dependent on the legality of plaintiffs' appointments under Puerto Rico's civil service laws). That Due Process claim is not dependent on the merits of plaintiffs' First Amendment claims; the inquiries are distinct.[8] See Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 98 (1st Cir.1997).
 
 
 38
 The judgment of the district court is vacated, and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 See, e.g., Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92 (1st Cir.1997); In re Martinez-Catala, 129 F.3d 213 (1st Cir.1997); Roldan-Plumey v. Cerezo-Suarez, 115 F.3d 58 (1st Cir.1997); Ortiz-Pinero v. Rivera-Arroyo, 84 F.3d 7 (1st Cir.1996)
 
 
 [2]
 Cappas said that the COPA document describing the position had originally stated that the position reported to the Secretary, but that this document was altered with liquid paper to state that the position reported to the Regional Directors. Cappas drew the inference that COPA had conspired with the Managerial Coordinators to alter the documents. There is no evidence that he considered another plausible explanation--that the alteration was a correction of a mistake in the original--and Cappas was unaware of plaintiffs' statements to Salivia in the field interviews that they had always reported to the Regional Directors. Of course, a reasonable jury could credit the plaintiffs' testimony and discredit the defendants' forgery theory
 
 
 [3]
 There is no evidence that the BMO director considered the possibility, also plausible, that the proper document from six years earlier simply had not been found. Plaintiffs have produced documents that tend to show that the BMO approved the Managerial Coordinator position and that there has always been budgetary authority for salaries and expenses associated with that position
 
 
 [4]
 Of course, "a new administration [cannot] use the 'nullity' of appointments doctrine as a cover of discharges, transfers, and discrimination based solely on political affiliation." Santiago-Negron v. Castro-Davila, 865 F.2d 431, 436 (1st Cir.1989)
 
 
 [5]
 The "unreasonably inferior" doctrine of Agosto-de-Feliciano was expressly limited to complaints of discrimination short of actual demotion. See id. at 1218 n. 8. Thus we need not consider whether that doctrine survives the Supreme Court's extension of First Amendment protections against patronage dismissals to "promotion, transfer, recall, and hiring decisions." Rutan, 497 U.S. at 79, 110 S.Ct. at 2739. "It is an interesting question whether some vestige of [the 'unreasonably inferior' rule] survives Rutan, thereby providing a sort of ... intermediate First Amendment haven for employees wounded by slings and arrows less damaging than those [official actions] described by the Rutan court." Nereida-Gonzalez, 990 F.2d at 705. That question must be answered another day
 The Rutan Court suggested in dicta that any adverse action against a public employee, no matter how minor, violates the First Amendment if it is in retaliation for an employee's exercise of First Amendment rights. See Rutan, 497 U.S. at 76 n. 8, 110 S.Ct. at 2738 n. 8 ("The First Amendment ... protects state employees ... from even an act of retaliation as trivial as failing to hold a birthday party ... when intended to punish [them] for exercising [their] free speech rights." (internal quotation marks and citation omitted)). We do not regard such colorful rhetoric as necessarily foreclosing something like the "unreasonably inferior" rule for personnel actions short of demotions or transfers. The Rutan Court was concerned with "deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform their beliefs and associations to some state-selected orthodoxy," id. at 75, 110 S.Ct. at 2737, a formulation similar to Agosto-de-Feliciano 's standard that "the new work conditions would place substantial pressure on even one of thick skin to conform to the prevailing political view." Agosto-de-Feliciano, 889 F.2d at 1218. We leave the resolution of any conflict in the standard for such adverse personnel actions to some future case.
 
 
 [6]
 Of course, political diversity among the Managerial Coordinators would not doom plaintiffs' claim. Defendants cannot prevail simply by showing that a desire to reward their political supporters, rather than a desire to punish their political opponents, underlay their decision. Either motive may produce unlawful results. The First Amendment condemns "the coercion of belief that necessarily flows from the knowledge that one must have a sponsor in the dominant party in order to retain one's job." Branti v. Finkel, 445 U.S. 507, 516, 100 S.Ct. 1287, 1294, 63 L.Ed.2d 574 (1980). That coercion is equally unlawful when it is directed toward apolitical career employees as when it is directed towards a party's political opponents. See Bennis v. Gable, 823 F.2d 723, 731-32 (3d Cir.1987). That a party chooses to reward its followers with good jobs inevitably affects those who are not followers and who see their upward mobility in the agency thwarted in very concrete ways. Here, plaintiffs say their duties were assumed by NPP members. Rutan expressly discussed the effect on First Amendment rights of employees left in such dead-end jobs. See Rutan, 497 U.S. at 73, 110 S.Ct. at 2736
 
 
 [7]
 The posture of this case makes it inappropriate to conduct a full-scale examination of the so-called "changeover" or "reorganization" defense established by Agosto-de-Feliciano, 889 F.2d at 1220-22 in light of Rutan. However, we can say that, after Rutan, a public employer may not assign tasks to supporters of the party in power because it believes, solely on the basis of their party affiliation, that such employees will more loyally implement its policies--notwithstanding language in Agosto-de-Feliciano that might be read to support such a decision. See Agosto-de-Feliciano, 889 F.2d at 1221
 
 
 [8]
 We take the case as we find it--with defendants not articulating a defense based on the Elrod-Branti exception--and so we also do not delve into a question, not briefed by any of the parties, as to whether the Due Process analysis is altered in any way if defendants may validly cause a reclassification of a position from a civil service position to one in which political affiliation is a legitimate requirement, and how, under the laws of Puerto Rico, an agency may accomplish this