**Generoso PEREZ–TRUJILLO,**
**Plaintiff, Appellant,**

v.

**VOLVO CAR CORPORATION**
**(SWEDEN), Defendant,**
**Appellee.**

No. 97–1792.

United States Court of Appeals,
First Circuit.

Heard Nov. 4, 1997.

Decided March 5, 1998.

Eduardo M. Joglar, Hato Rey, PR, with whom Esther Crespín Credi, Guaynabo, PR, and Law Offices of Eduardo M. Joglar, Hato Rey, PR, were on brief, for appellant.

Carlos A. Steffens, Guaynabo, PR, with whom Manuel A. Guzmán and Manuel A. Guzmán Law offices, were on brief, for appellee.

Before LYNCH, Circuit Judge, CYR, Senior Circuit Judge, and DiCLERICO *, District Judge.

CYR, Senior Circuit Judge.

■ Plaintiff Generoso Perez–Trujillo ["Perez"] challenges a district court order awarding summary judgment to defendant Volvo Car Corporation (Sweden) ["Volvo"] in this strict product liability action. We reverse and remand for further proceedings.

## I

### BACKGROUND [1]

On August 10, 1993, Perez was operating a new 1993 Volvo 940 GL381 along a smooth, straight roadway in Bayamon, Puerto Rico, when the air bag on the driver's side prematurely deployed, causing him to lose consciousness and collide with an oncoming vehicle driven by Alexis Pagan Marrero ["Pagan"]. Perez sustained a permanent cervical disc herniation.

Just before the collision, Pagan had seen the Perez vehicle "zigzagging" and observed a "big [air] bag" and "white smoke" in the driver's compartment. After the accident, the air bag sensor, which monitors the rate

* Of the District of New Hampshire, sitting by designation.

1. We relate the background facts in the light most favorable to Perez, the nonmoving party.

See Acosta–Orozco v. Rodriguez–de–Rivera, 132 F.3d 97, 98 (1st Cir.1997).

of vehicle deceleration, was sent to Volvo for testing.[2]

The air bag is designed to inflate and deflate within one-fifth of a second, an event undetectable by the human eye. During deployment, the diagnostic unit in the sensor records the actual vehicle deceleration rate, the status of the battery powering the air bag, and any fault codes. Following deployment, the electrical circuits in the sensor burn out and cannot record further data.

The air bag deployment analysis report ["ADAR"] subsequently issued by Volvo reflected that the sensor had recorded "a ['low violence'] crash," normal battery status, with *no fault codes indicating abnormal functioning.* Based on these data, Bengt Schultz, a qualified air bag expert employed by Volvo, concluded that the air bag must have deployed after, rather than before, the collision.

Perez brought suit against Volvo in federal district court, asserting a strict product liability claim based on the theory that the Perez injury was proximately caused by the air bag system, which had been defective when it left the Volvo factory. Volvo moved for summary judgment, in reliance on the ADAR and the expert testimony presented by its employee, Schultz. Perez responded with (1) eyewitness deposition testimony from Pagan; (2) an affidavit from Luis Diaz Gandia, a putative air bag expert;[3] and (3) the written responses Volvo provided in July 1994 to a National Highway Traffic Safety Administration ["NHTSA"] investigation, in which Volvo could not explain what caused several so-called "inadvertent [Volvo air bag] deployments" reported to the NHTSA.

The district court ultimately awarded summary judgment to Volvo, for the following

reasons.[4] First, the court considered intrinsically incredible the Pagan eyewitness testimony that the air bag had inflated and "stayed inflated," given the uncontroverted expert testimony that air bags inflate and deflate too rapidly for the human eye to detect. Second, the ADAR and the expert testimony from Schultz conclusively refuted the Pagan eyewitness testimony, since the sensor is designed to stop recording data once the air bag deploys, and therefore a premature deployment would have disabled the sensor from recording the subsequent collision. Finally, the district court noted that Perez presented no competent "scientific information" to demonstrate that the air bag had "functioned differently from any other produced by Volvo in that year," nor any "scientific explanation how the air bag in question malfunctioned or was poorly designed." Thereafter, the court denied the motion for reconsideration submitted by Perez. *See* Fed.R.Civ.P. 59(e).

## II

## *DISCUSSION*

We review the summary judgment ruling *de novo,* viewing all disputed facts and reasonable inferences favorably to Perez, the nonmoving party. *See Acosta–Orozco v. Rodriguez–de–Rivera,* 132 F.3d 97, 98 (1st Cir.1997). The summary judgment ruling cannot stand unless Perez failed to adduce sufficient competent evidence to generate a trialworthy issue as to some element essential to his case. *See FDIC v. Elder Care Servs., Inc.,* 82 F.3d 524, 526 (1st Cir.1996) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)).

---

**2.** Should it detect a rate of frontal deceleration beyond preset tolerances—the "deployment threshold"—the sensor transmits an electrical signal to the ignitor located within the air bag inflator, causing an ignition which instantaneously fills the air bag with nitrogen gas.

**3.** Diaz, a professor of electrical engineering, attested that insurance industry studies have indicated that non-collision, inadvertent air bag deployments occur in about 6 out of every 75,000 deployments, and that an air bag sensor's performance may be diminished by adverse external factors such as humidity.

**4.** Although the district court had noted its own serious reservations regarding the admissibility of the proffered expert testimony from Diaz and the NHTSA investigative report, *see infra* note 7, its dismissal order was not predicated on any evidentiary exclusion. Instead, the court simply discounted the *weight* to be accorded the proffered expert testimony from Diaz. The court opined that Diaz had "provided [only] a scientific veneer, based on no testing or studies." *See infra* at pp. 54–55 (referencing *Daubert*).

Under Puerto Rico law, Perez must prove four essential elements; *viz.* (1) the Volvo air bag had a "manufacturing defect" of which Perez was unaware, (2) the defect made the air bag system "unsafe," [5] (3) the usage to which the air bag was put by Perez was reasonably foreseeable by Volvo, and (4) the defect proximately caused injury to Perez. *See Rivera Santana v. Superior Packaging Inc.*, No. 89–593, 1992 WL 754830, at *4 (P.R. Dec. 9, 1992); *see also Malave–Felix v. Volvo Car Corp.*, 946 F.2d 967, 971 (1st Cir. 1991). Given satisfactory proof of these four essential elements Volvo would be strictly liable even though the air bag was manufactured with reasonable care and regardless whether Perez owned the Volvo. *See* Restatement (Second) of Torts § 402A. Only the first and second elements are at issue here.

As to the first element, a "manufacturing defect" is present if the product "differs from the manufacturer's intended result or from other ostensibly identical units of the same product line." *Rivera Santana*, No. 89–593, 1992 WL 754830, at *5 n. 7. Volvo does not deny that competent proof of an air bag deployment *prior* to a frontal collision would establish the requisite unsafe defect. Volvo insists, however, that the district court correctly dismissed, as incredible, the proffered testimony that Pagan saw the air bag "inflated," since it is undisputed that the human eye cannot perceive the inflation-deflation event. Since we cannot agree with the district court's characterization of the Pagan testimony, we are unable to accept its conclusion.

In so construing the Pagan eyewitness account, the district court failed to treat the evidence in the light most favorable to *Perez*, the nonmoving party. *See Acosta–Orozco*, 132 F.3d at 98. Pagan did not unambiguously attest either that he saw the air bag inflate or while inflated, much less that it "stayed inflated." Rather, Pagan simply stated that just before the collision he observed that "this [*i.e.*, the Perez car] has the air bag open...." [6] Thus, even assuming an air bag *deployment* cannot be detected by the human eye, fairly construed the Pagan eyewitness account indicates that he saw the air bag "fully" deployed—that is, after it had *inflated and deflated.*

Further, Pagan attested that he did not "see" the driver of the Volvo, but never intimated that it was the air bag ("fully" inflated or otherwise) that obstructed his view of the driver. Whether this was because Perez was no longer upright in the driver's seat after having been knocked unconscious during the air bag deployment, or because, as Pagan also attested, the Volvo was already "zigzagging" (*i.e.*, Perez had already lost control), were material matters which required further factfinding. Moreover, Perez also represented that two other eyewitnesses, riding with Pagan, would corroborate Pagan's observations at trial.

---

5. The Puerto Rico courts generally embrace the principles of strict product liability prescribed in the Restatement (Second) of Torts § 402A. *See Malave–Felix v. Volvo Car Corp.*, 946 F.2d 967, 971 (1st Cir.1991) (citing *Mendoza v. Cerveceria Corona, Inc.*, 97 P.R.R. 487, 495–96 (1969)). The "unsafeness" criterion is the single significant departure, as it further relaxes the claimant's burden, under the Restatement, of proving that the defective product was "unreasonably dangerous." *See id.* (citing *Montero Saldana v. American Motors Corp.*, 107 D.P.R. 452 (1978)).

6. The record contains a single page of the Pagan deposition, which Volvo did not choose to supplement:

    Q: Okay. When you see Mr. Perez before the accident, eh—what was he doing? If you had the opportunity to see him.
    A: No. No I don't see him.

    Q: Okay. But you did see the automobile as it approached zigzagging?
    A: Yes.
    Q: Do you know why the automobile was zigzagging? If you know.
    A: Repeat the question, please.
    Q: Do you know the reason for which the automobile was zigzagging? If you know. For example: did it have something stuck in the axle of whatever? Or don't you know?
    A: Yes. The air bag.
    Q: The air bag?
    A: Yes. I see a—the big bag and I see white smoke inside the car. I see that is the problem, I—the first thing I say is—in my mind, well, listen, this—has the air bag open, that is—
    Q: Okay. That is, that when—before the accident, or was it after the accident that you saw the air bag?
    A: No, before, before.

For its part, Volvo presented no evidence that an oncoming driver could not see an "open" (*i.e.*, deployed and deflated) air bag in these circumstances. Nor did Volvo undermine the probativeness of the deposition testimony that Pagan simultaneously observed "white smoke inside the [Perez] car," presumably a reference to the release of white powder which normally accompanies an air bag deployment. In our view, therefore, the eyewitness testimony from Pagan could not be dismissed as incredible without resorting to impermissible factfinding. *See Abraham v. Nagle*, 116 F.3d 11, 15 (1st Cir.1997) ("It was not, of course, [permissible] ... to resolve credibility issues on summary judgment.").

Next, Volvo suggests that it proffered other competent evidence—the ADAR and the expert testimony from its employee, Schultz—which was so conclusive that no rational factfinder could credit the eyewitness deposition testimony from Pagan. Volvo emphasizes, in particular, that the electrical circuits in the air bag sensor burn out as soon as the bag deploys, rendering the sensor incapable of recording further impact data, and therefore that the sensor could not have recorded the Perez–Pagan "crash" had the bag deployed prematurely.

Nevertheless, the Volvo proffer did not rule out a reasonable inference that—for whatever reason, known or unknown—the sensor may have received or recorded a false deceleration or impact reading, mistaken normal driving conditions for a collision, and falsely stored that nonevent as "a ['low vio-

lence'] crash." Of course, Schultz did state, though without any factual predicate or explanation, that "[a]n air bag sensor, even if defective, cannot, and will not, record information of an accident that did not occur."

We find particularly troubling Volvo's counterintuitive assumption that an electrical component *cannot* malfunction and that its unfailing performance can be predicted with absolute certainty in any and all circumstances. True, Volvo was unable to induce another false reading from this sensor, but the ADAR in no way suggests that Volvo attempted to replicate the exact external conditions to which the sensor had been subjected *in situ* on August 10, 1993. *Cf. Bogosian v. Mercedes–Benz of N.A., Inc.*, 104 F.3d 472, 480 (1st Cir.1997) ("Where, as here, a conclusion that a product was defective derives from a test or examination of it, there must be sufficient evidence to support a finding that the product was in substantially the same condition—in relevant respects—when tested as it was at the time of the accident. The absence of such a showing renders irrelevant any testimony based on the test or examination.").

Further, Volvo's sweeping assumption was placed in serious question by Perez. In its July 1994 written response to the NHTSA investigation of inadvertent air bag deployments, Volvo acknowledged that external conditions, such as exposure to humidity, might affect the performance of its air bag system, and that in some cases "Volvo cannot reasonably determine why the [alleged premature] deployment occurred."[7] *See Abra-*

---

7. We cite the NHTSA report only to demonstrate that Volvo's written responses to the NHTSA generate a trialworthy credibility issue in that they tend to refute Schultz's expert testimony that Volvo sensor readings are infallible. Since the 600–page NHTSA report was on microfilm, Perez proffered only a few transcribed pages, but made clear his willingness to produce the entire report to the district court on request. However, before dismissing the case, the district court instead decided to reserve for trial any question concerning the admissibility of the report on the "defect" issue. *See supra* note 4. As the proponent of the report, of course, Perez will need to satisfy the district court on remand that the reports of inadvertent deployments received from consumers by the NHTSA are not inadmissible hearsay. *See, e.g.,* Fed.R.Evid. 803(8)(A) (public agency statements "in any form" setting forth

"the activities of the office or agency" are not hearsay). Without regard to whether the entire NHTSA report is admissible, however, there presently appears no reason to believe at the summary judgment stage that the responses Volvo provided in the NHTSA investigation—relied upon here—could not be introduced as admissions of a party-opponent. *See* Fed.R.Evid. 801(d)(2).

Furthermore, Perez claims that the NHTSA investigation involved 1993 Volvo 900 models like the one Perez was driving on August 10, 1993, yet his abbreviated proffer dealt only with 1991 models. Since "[t]he reports of other incidents would be probative evidence of the existence of a[] defect only if the incidents occurred under circumstances substantially similar to those surrounding [plaintiff's] accident," *Camer-*

*ham,* 116 F.3d at 15 (witness credibility normally a matter for factfinding); *see also Den Norske Bank AS v. First Nat'l. Bank,* 75 F.3d 49, 58 (1st Cir.1996). Thus, we cannot accept the contention that no rational factfinder could do other than reject the Pagan eyewitness testimony in light of the Volvo proffer.

Lastly, Volvo insists that a strict liability claimant cannot establish an unsafe defect in a product without expert or scientific evidence. Since it does not affect our decision, we accept *arguendo* Volvo's contention that the expert testimony proffered by Perez would be inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See supra* note 4.

■ The Supreme Court of Puerto Rico has yet to address this precise issue. Thus, "we look to 'analogous state court decisions, persuasive adjudications by courts of [the] states, learned treatises, and public policy considerations identified in state decisional law' in order to make an 'informed prophecy' of how the [Puerto Rico Supreme Court] would rule." *Rodriguez–Suris v. Montesinos,* 123 F.3d 10, 13 (1st Cir.1997).

Puerto Rico consistently has looked to the Restatement (Second) of Torts § 402A in defining its strict product liability doctrine. *See Malave–Felix,* 946 F.2d at 971; *supra* note 5. Accordingly, asked to predict Puerto Rico law, we have consulted the pertinent case law available in other jurisdictions which likewise embrace the Restatement model.[8] Our task in the present context is straightforward.

■ Jurisdictions which model their decisional law along Restatement lines *uniformly* hold that a strict liability claimant may demonstrate an unsafe defect through direct eyewitness observation of a product malfunction, and need not adduce expert testimony to overcome a motion for summary judgment. *See, e.g., Collazo–Santiago v. Toyota Motor Corp.,* 937 F.Supp. 134, 139 (D.P.R.1996) (predicting that Puerto Rico courts would adopt California law, where it is well settled that "a plaintiff in a products liability action is entitled to present her case without relying on the testimony of an expert witness").[9] " 'Although it is helpful for a plaintiff to have direct evidence of the defective condition which caused the injury or expert testimony to point to that specific defect, such evidence is not essential in a strict liability case based on § 402A [of the Restatement (Second) of Torts],' " and direct observation of " '[t]he malfunction itself is circumstantial evidence of a defective condition.' " *Ducko v. Chrysler*

---

on v. Otto Bock Orthopedic Indus., Inc., 43 F.3d 14, 16 (1st Cir.1994), it would remain for Perez to lay a proper evidentiary foundation for the latter evidence.

**8.** See, e.g., Benitez–Allende v. Alcan Aluminio do Brasil, 857 F.2d 26, 34 (1st Cir.1988) (predicting Puerto Rico law in light of fact that "Puerto Rico ... has chosen to adopt the principles of strict liability laid out in Restatement (Second) of Torts § 402A (1965)"); Guevara v. Dorsey Labs., 845 F.2d 364, 365 (1st Cir.1988) (same); McPhail v. Municipality of Culebra, 598 F.2d 603, 605 (1st Cir.1979) (same).

**9.** See, e.g., Woods v. General Motors Corp., No. 920516326S, 1996 WL 57016, at *3 (Conn.Super.Ct. Jan. 24, 1996) ("We conclude that in a product liability action, it is not necessary to present expert testimony to establish [a genuine factual dispute] that [a vehicle] was defective."); Varady v. Guardian Co., 153 Ill.App.3d 1062, 106 Ill.Dec. 908, 506 N.E.2d 708, 712 (1987) (same, where "plaintiff testified that as she turned to her left with her crutches under her armpits, the left crutch collapsed, causing her to lose her balance

and fall"); Virgil v. "Kash N' Karry" Serv. Corp., 61 Md.App. 23, 484 A.2d 652, 656 (1984) (same, where plaintiff testified "that a thermos bottle ... implode[d] when coffee and milk [were] poured into it," since testimony would prove that the "product fail[ed] to meet the reasonable expectations of the user"); Tune v. Synergy Gas Corp., 883 S.W.2d 10, 14 (Mo.1994) (en banc) (same); Falls v. Central Mut. Ins. Co., 107 Ohio App.3d 846, 669 N.E.2d 560, 562 (1995) (same, where plaintiff attested that "the seat belt came unfastened during the collision," despite expert's opinion that belt was not defective); Dansak v. Cameron Coca–Cola Bottling Co., 703 A.2d 489, 496–97 (Pa.Super.Ct.1997) (same, where plaintiff stated that "[s]he opened the carton, removed a six-pack, and was cut by a broken bottle in the six-pack"); Sipes v. General Motors Corp., 946 S.W.2d 143, 154 (Tex.App.1997) (same, where plaintiff contended that air bag failed to deploy, and defendant's expert contradicted) (citing McGalliard v. Kuhlmann, 722 S.W.2d 694 (Tex. 1986)); Potter v. Van Waters & Rogers, Inc., 19 Wash.App. 746, 578 P.2d 859, 865 (1978) (same, where lay witnesses testified that rope was defective).

*Motors Corp.*, 433 Pa.Super. 47, 639 A.2d 1204, 1206 (1994) (citations omitted). Thus, a manufacturer's own employee-expert does not necessarily trump a strict liability claimant's circumstantial non-"expert" evidence at the summary judgment stage. *See id.* at 1207 ("In granting [defendant's] motion for summary judgment in the instant case, the trial court relied upon the deposition testimony and reports submitted by Chrysler's expert. This was error. [Plaintiff's] testimony of the erratic performance of the vehicle's steering and braking systems, under the circumstances of this case, was sufficient to make out a prima facie case of a manufacturing defect in the vehicle. The issue of strict liability, therefore, was a disputed issue for the jury.").[10] Therefore, even if the expert testimony proffered by Perez were to be excluded, *see supra* note 3, the Pagan eyewitness testimony—standing alone—represented competent evidence that the air bag in the Perez Volvo had an unsafe defect. *See Sipes v. General Motors Corp.*, 946 S.W.2d 143, 154 (Tex.App.1997) (noting that "[t]he fact finder may accept lay testimony [that an air bag failed to deploy during frontal collision] over that of [defendants'] experts").[11]

Of course, we express no opinion regarding the relative persuasiveness of the competing Rule 56 proffers, which is a matter for the trier of fact.

*The district court judgment is VACATED and the case is remanded for further proceedings consistent herewith; costs to appellant. SO ORDERED.*

---

10. Indeed, strict liability claimants may resort to an array of circumstantial evidence. *See Dansak,* 703 A.2d at 496 ("Such circumstantial evidence includes (1) the malfunction of the product; (2) expert testimony as to a variety of possible causes; (3) the timing of the malfunction in relation to when the plaintiff first obtained the product; (4) similar accidents involving the same product; (5) elimination of other possible causes of the accident; and (6) proof tending to estab-

lish that the accident does not occur absent a manufacturing defect.").

11. We consider only the caselaw defining the standard governing strict product liability claims, like the present, which allege unsafe manufacturing defects. We take no position in regard to the standard applicable to strict liability claims based on design defects, or product liability claims sounding in negligence.