Reid v. Simmons, et al.                    CV-89-152-M    03/06/98

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Gordon C. Reid

     v.                                    Civil No. 89-152-M

Officers Gary Simmons, Ronald Paul,
James Ahern, and Richard Gilman


                        **O R D E R**


     Defendants, Officers Simmons, Paul, Ahern, and Gilman, move

for summary judgment with respect to all of Gordon Reid's

remaining claims.  Reid objects and moves for summary judgment in

his favor.  For the reasons that follow, the court grants summary

judgment in favor of the defendants.


                    **STANDARD OF REVIEW**

     Summary judgment is appropriate if the "pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  The moving party first must show the absence of a genuine

issue of material fact for trial.  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 256 (1986).  If that burden is met, the

opposing party can avoid summary judgment on issues that it must

prove at trial only by providing properly supported evidence of

disputed material facts that would require trial.  Celotex Corp.

v. Catrett, 477 U.S. 317, 322 (1986).

A genuine factual issue exists if a reasonable jury could decide the issue in favor of the nonmoving party, and a fact is material if its resolution can affect the outcome of the suit under the applicable substantive law.  See Woods-Leber v. Hyatt Hotels of Puerto Rico, Inc., 124 F.3d 47, 49 (1st Cir. 1997). The court interprets the record in the light most favorable to the nonmoving party and resolves all inferences in its favor. Saenger Organization v. Nationwide Ins. Assoc., 119 F.3d 55, 57 (1st Cir. 1997).  Nevertheless, the nonmoving party cannot rest on conclusory allegations, unsupported inferences, or speculation to avoid summary judgment on issues it bears the burden to prove at trial.  Woods-Leber, 124 F.3d at 49.  Thus, summary judgment will be granted if the record shows no trialworthy factual issue and if the moving party is entitled to judgment as a matter of law.  EEOC v. Green, 76 F.3d 19, 23 (1st Cir. 1996).

The parties have filed cross motions for summary judgment. The pendency of cross motions does not alter the summary judgment standard or necessarily require entry of judgment in favor of one side or the other.  Wightman v. Springfield Terminal Railway Co., 100 F.3d 228, 230 (1st Cir. 1996).  Rather, the court must consider each motion separately, construing the facts and resolving inferences according to the applicable standard with respect to each motion.  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

2

## BACKGROUND

Taking the motions in their filing order, the court first considers defendants' motion for summary judgment. In the context of defendants' motion, Reid is the nonmoving party. Accordingly, the material facts are taken and all inferences are resolved in his favor.

Reid has filed copies of reports related to the Price family obtained from the New Hampshire Division of Children and Youth Services (now Division of Children, Youth, and Families "DCYF"). The New Hampshire DCYF records include reports pertaining to the Prices from the Maine social services department, which were generated while the Prices lived in Maine during 1983 and 1984. Reid asserts that the defendants should be charged with knowledge of the contents of the New Hampshire DCYF file at the time of his arrest. Reid has not provided any evidence from which it could be found that the police ever had copies of the DCYF files in their possession or had any other knowledge of the contents of the files, either before his arrest or during his subsequent prosecution.

Each police officer defendant says in his sworn interrogatory answers that he was unaware of the existence of a DCYF file pertaining to the Price family during that time. Officer Simmons also says in his affidavit that, in the course of his duties, he directed a search of the Manchester Police Department records, and that no DCYF file on the Price family was

found.[1]  Simmons says that he does not recall ever having had access to such a file, and that his only knowledge of the file is derived from this civil case.  Thus, the record establishes that the named defendants did not have knowledge of the Prices' DCYF files, or access to them, when Reid was arrested and prosecuted.

Alternatively, Reid asserts that the named defendants should be charged with constructive knowledge of the contents of the files because they "collaborated" with DCYF employees during their investigation and because their failure to access the files indicates "willful blindness" to the allegedly exculpatory information in the files.  Reid points to no legal duty obligating a police officer to seek information about a sexual assault victim from a social services agency before making a probable cause decision.  In response, defendants explain that even if they thought to do so, it is likely they would have been denied access had they attempted to review the file, due to confidentiality interests protected by statute.

Reid has not shown, or presented any information tending to show, that the police officers or the police department had the DCYF files in their possession, had any duty or opportunity to access the files, or were aware of any relevant information contained in the files (other than what also appeared in police reports) in connection with, or at any time relevant to, Reid's

---

[1]  The document dated June 19, 1986, that Reid previously thought was a police department request for DCYF files has been definitively shown to be a request by DCYF for police records about the assault on Misty Price.

4

arrest and prosecution for sexual assault upon Misty Price. Accordingly, on the record presented here, no triable issue exists as to whether defendants had the Prices' DCYF file, or were aware of information contained in that file but not contained in police department records. Since the information in the DCYF file is not material to Reid's claims against the defendant officers, it is not included in the factual summary.

## A.  Facts

During the evening of June 18, 1986, Ruth Price and her friend, Patricia Cushing, brought Price's six-year old daughter, Misty, to the Manchester Police station, where they reported that the child had been raped and beaten the night before. Ruth Price had had several prior contacts with the Manchester police involving Misty, as well as her older daughter, Wendy. Each prior contact included allegations of abuse or sexual assault, and each reported incident was investigated, as memorialized in police reports.

### 1.  April 1985 Report

On April 22, 1985, Ruth Price reported, to the Manchester police, that her daughter Wendy, who was then sixteen years old, failed to return from a baby sitting job. Price believed Wendy was with her boyfriend, William Bourdeleau. Price also told the police that she and Wendy were receiving counseling through the welfare department. Several days later, Judy Malcolm of DCYF

5

contacted the Manchester Police Department about Wendy Price and reported that Wendy might be at a particular address with a Ms. Durham.

The police went to Durham's apartment, where they spoke with Durham's brother, William Bourdeleau.  Bourdeleau told them that Wendy had been there and was expected to return.  He explained that he and Wendy recently spoke to Judy Malcolm about abuse that Wendy was experiencing at home, and he asked about a possible welfare investigation.  He also said that Malcolm had warned Wendy to stay away from the police because they would return her to her home.  When asked by police, Malcolm denied having given that advice and confirmed that if Wendy was found, she was to be returned to her home.  On May 2, 1985, however, the police were notified by DCYF that Wendy should not be returned to her mother, but instead the police should contact DCYF.  When the police contacted DCYF in the process of updating their missing persons files, in August of 1985, they were informed that Wendy had been returned to her mother and that both were in family therapy.

### 2.    December 1985 Report

On December 22, 1985, the Manchester police were notified by Diane Walsh (who is not further identified, but may have been a teacher in Misty Price's Easter Seals readiness program) that Misty might have been sexually abused.  Misty had drawn pictures and described sexual activity she engaged in with someone she identified as "Dan" or "Daniel."  Officer Simmons, who

investigated that matter, reported that Ruth Price told Walsh that Misty might have been sexually assaulted previously, when the family lived in Arizona. Price described a prior incident when she found Misty bleeding from her vagina and had her examined by a physician, who found irritation and redness but could not determine the cause. In giving the family history, Price also said that there had been past accusations of sexual and physical abuse of both Misty and her older daughter, Wendy.

Officer Simmons, Walsh, and Bob Boisvert from DCYF, interviewed Misty in the school principal's office. Boisvert gave Misty anatomically correct dolls and reviewed her knowledge of, and terminology used in reference to the dolls' genitalia. Then, asking her to pretend that the female doll was "Misty" and the male doll was "Dan," Boisvert asked Misty to show them what had happened. Misty demonstrated sexual intercourse as well as other sexual activity with the dolls. Misty said that "Dan" was not her young friend named Dan, that he was an older man who could become a boy, that he had keys to her house, that he would take her with "Debbie's babies" to the park, and that her mother once caught him in bed with her and called the police. Her physical description of "Dan" resembled that of her mother's boy friend, but she denied that was who she meant. Officer Simmons wrote that Misty was very confused and imaginative during the interview and told them "bizarre things" dealing with abuse, injury, and violence.

7

Officer Simmons concluded that Misty had obviously been victimized sexually and physically and had "suffered greatly" from violence.  Ruth Price offered little help in identifying "Dan."  The only related information she could recall was that police were involved in an incident in Maine when she found Misty and a boy named "Dan" examining each other under a bed.  Debbie Mitchell, who lived with the Prices and had two babies, said that no one took the children to the park and that she did not know who "Dan" might be.  The police closed that criminal investigation given the sketchy information about the alleged assault and the identity of the perpetrator.

### 3.    April 1986 Report

The second report of sexual abuse involving Misty occurred on April 4, 1986.  Rosie Emmons, a friend of the Price family, reported to the Manchester police that Misty had been sexually assaulted by someone named "George" when Misty was staying with Emmons.  The police report says that Emmons was "somewhat slow" and that she had "difficulty" explaining what had happened.  The discussion apparently suggested that someone named "Clayton Hardy," who had previously been arrested in connection with sexual incidents, might be involved.

Officer Simmons interviewed Ruth Price about Emmons's report.  Price said that she did not think that anything had happened to Misty.  She said that when Misty stayed with Emmons, some three weeks before Emmons's report to the police, both Misty

and Emmons told Price that Misty had had a good time and Emmons did not mention any incident involving "George" or anyone else. Price thought that Emmons might have reported an incident as a "vendetta" against "George" because she was having "difficulty" with him.

Officer Simmons interviewed Misty in her mother's presence. When Simmons asked Misty about her stay with Emmons, she said that she had had a nice time. Misty knew Clayton Hardy but "had nothing bad to say about him," and she said she did not know anyone named "George" who knew Emmons. Misty said no one had touched her while she stayed with Emmons. During the interview, Misty played with anatomically correct dolls, frequently dressing and undressing them. At one point, she told Simmons that she had something important to show him. She then demonstrated sexual intercourse with the dolls saying that was what "Jason" had done. When asked who "Jason" was, she said, "Jason Price." Simmons wrote, erroneously, that Misty had been interviewed in December (1985) about someone named "Jason." (The December 1985 police report in fact mentions "Dan" or "Daniel," not "Jason.") When the police determined that they could not confirm Emmons's report, that investigation was closed as well.

### 4.   June 1986 Report

On June 18, 1986, Ruth Price and her friend Patricia Cushing reported the incident that led to Gordon Reid's arrest. That evening, the police dispatcher summoned Officers Paul and Gilman

9

to talk with Price and Cushing, who were at the station.  They told the officers that Misty had been sexually and physically assaulted.  Officer Paul spoke to Price while Officer Gilman spoke to Cushing and Misty.

Ruth Price told Officer Paul that she and her two daughters, Misty (then six years old) and Wendy (then seventeen years old), were temporarily living in Gordon Reid's apartment, until they could find a place of their own.  She said that Reid's girlfriend, Lisa, also lived there.  Price said she went out on the evening before (June 17th), leaving Wendy watching television and Misty asleep, and that no one else was in the apartment.  Price spent the night with a male friend and did not return until just before noon the next day (June 18th).  When she returned, Misty ran to her and said that she had blood coming from her "peepee."  Price said she asked Wendy what happened, and Wendy told her that Misty crawled into bed with her that morning and she noticed blood on Misty's underpants.  Wendy told her mother that she asked Reid, but he denied knowing anything about it.  Price said she could not get any more information from Misty, and at first thought Misty might have injured herself while masturbating.

That evening (June 18th) Price and Misty went to Hampton Beach with Reid and his girlfriend, Lisa.  Price said that Misty was not her usual self during the ride, but that Misty would not tell her what was wrong.  When they returned home at about 8:30, Price's friend, Patricia Cushing, met them.  Price said that

10

Misty told Cushing that "Gordon had put his fingers in her Pee-Pee." Following that revelation, and because there were marks and scratches on Misty's back, Price said she thought something had happened, and she and Cushing decided to go to the police.

Officer Gilman interviewed Misty and Cushing. Gilman at first found it difficult to understand Misty because she was crying and trembling. Cushing was able to reassure her. Misty then said "that Gordy had hurt her with his finger" and pointed to the area of her vagina. Gilman decided to employ anatomically correct dolls to help Misty explain. Based on Misty's demonstration and explanation, Gilman concluded that Misty meant that "Gordy" had inserted his penis into her vagina. At that point, Gilman decided to take Misty to the hospital, Catholic Medical Center "CMC," for a medical examination.

At CMC, Gilman interviewed Cushing while Officer Paul interviewed Misty and her mother. Paul noted that Misty now felt quite comfortable with him, and he asked her if she could tell him what happened. Misty said that she had been sleeping in bed when Gordon got her up and carried her to his car. She said that Gordon told her to take off her clothes and that she started to cry. Gordon took his own clothes off and then put his finger in her "Pee-Pee," telling her that he was going to make a hole. Misty demonstrated what he had done. She described further sexual activity by Gordon including that "he went Pee-Pee." She said that when she cried and screamed, Gordon slapped and scratched her. She could not explain how she had gotten away

11

from him.  When Paul asked her why she had not immediately told her mother what had happened, she said that Gordon warned her that if she told her mother, he would do it again.  Misty told Paul that Wendy had given her a bath that morning but that she had on the same outer clothing.  Misty then was examined by the doctor.

Misty told the doctor, as recorded in her medical report, that she was awakened the night before by a man who took her to his car, removed her clothes, penetrated her vagina with his finger, touched her genitalia with his mouth, covered her mouth to stop her screaming and struck her on the back and face.  She said that when car lights flickered, the assault moved to the bushes.  She said that she eventually ran away and went back to bed.  She identified her assailant as "Gordon," "Ramsey's brother."  Misty also complained to the doctor of pain in her vaginal area.

The record of physical examination reports that Misty had abrasions, redness, and swelling on her face, and abrasions and redness on her back, and legs.  Her vaginal area was very red, raw, and swollen.  The medical record also notes that the patient, Misty, was hysterical during the pelvic examination.  The medical diagnosis was unequivocal — sexual assault.

Cushing reported to Officer Gilman that she first heard about the problem with Misty at about 5:30 that night when Misty's sister, Wendy, called to tell her that they would not be able to have dinner with Cushing.  Wendy told Cushing about Misty

12

waking her that morning with blood on her underpants and that Misty had also shown Wendy bruises on her back and face that she said were where Gordon had hit her.  Cushing advised Wendy to take Misty to the hospital.  Later, Cushing decided to check on Misty herself.

Cushing told Gilman that when she arrived, Misty ran up to her, crying, and saying that "Gordy" had hurt her and that she was bleeding.  Cushing noticed that Misty was trembling while she was holding her and, when asked, Misty told Cushing that Gordy hurt her with his finger, slapped her on the face and back, and held her mouth so that she could not yell.  Misty told Cushing that she was bleeding from her "Pee Pee" and that it scared her. Cushing said that while she was holding Misty, Reid drove by and stopped.  Misty then "put a choke hold on" Cushing and said she did not want to go with Reid because he hurt her.  Misty also told Cushing that the car Reid was then driving was different from the one she was in with him when the assault took place.

The officers decided that Officer Gilman and Ms. Cushing would go to Reid's apartment, where the Prices had been staying, to find Misty's underwear and the pantyhose that she had been wearing.  They spoke to Reid at the apartment and told him they were looking for Ruth Price's pocketbook and some of Misty's clothes.  Lisa Handyside was with Reid at the apartment.  Cushing found blood-stained pantyhose, but not Misty's underwear.  Reid asked Cushing to tell Ruth Price that she could not stay with him any longer and to get her things out of his apartment.  Officer

13

Gilman told Reid that they might want to talk with him soon. Gilman reported to Simmons that blood stained nylons were found on a dresser at Reid's apartment and that Misty's underpants, damp and clean, were found on the washer with other damp and clean laundry.

Over the next few days, the police again interviewed Ruth Price and Misty, and talked to Misty's sister, Wendy. When interviewed by Officer Simmons on June 20, Misty had some difficulty remembering the name of the man who assaulted her and again identified him as "Ramsey's brother." She then remembered he was "Gordon" who lives with "Lisa." Simmons asked Misty to identify specific body parts on anatomically correct dolls and then asked her to demonstrate what had happened. Misty again described what had happened and said that Gordon took her home when she started to bleed. When asked what made her bleed, she demonstrated intercourse with the dolls. She then demonstrated other sexual activity with the dolls. She said she was undressed when she found Wendy because Gordon put her underpants in the wash. She did not tell Wendy or her mother what had happened because Gordon said he would do it again. After the interview, Simmons asked Misty if she could point out Gordon's house from the car. Misty was upset by the prospect of going near the house and agreed only when assured that Gordon would not see her and that they would not stop. Misty correctly pointed out the building and said that the bushes in the front were the bushes where the assaults occurred.

14

Ruth Price said they moved into Gordon Reid's apartment on June 10, temporarily, and that the night of June 17 was the only time the girls were left alone at the apartment. She said that Misty went to bed fully clothed that night because she was tired and that Misty was wearing Ruth's nylons. Price said that Misty had no injuries when she went to bed that night.

Price again related that Misty told her, when she returned the next day, that she was "bleeding in her peepee." Price said that when they got into Reid's car to go to the beach on the evening of June 18, Misty noticed that it was a different car — that it was white and had rear seats while the car he had the night before was red and did not have rear seats. After the beach trip, Price said, Misty did not want her to leave to visit with Patricia Cushing because Misty did not want to be left alone with Reid. Price said that was unusual for Misty. Price also said that she found it odd that Reid was looking for her on the night of June 18, and was telling people that Price had accused him of raping Misty.

During her interview, Wendy said that Misty went to bed on the night of June 17 fully clothed and wearing their mother's nylons. Wendy watched television until about 2:00 a.m., and then slept on the couch. She awoke at some time during the night to find Gordon Reid sitting on the end of the couch; he said he was going to bed, and Wendy went back to sleep. At 6:00 a.m., Wendy found that Misty had climbed onto the couch with her. Wendy noticed that Misty was wearing only her purple shirt and had

15

blood on her inner thighs.  Misty was upset and told Wendy that "a little boy touched her."  When Wendy tried to wipe the blood off with a sponge, Misty would not let her and then Wendy noticed that the blood was coming from her vaginal area.  She also noticed redness and irritation and a big scratch and bruises on her back.

Wendy reported that Reid came out of his bedroom and asked what the problem was.  Wendy and Reid questioned Misty, and Wendy noticed that Reid was much nicer than usual to Misty, promising her toys if she would tell them what happened.  After bathing Misty, Wendy laid down on the couch with Misty who clutched Wendy and would not let go.  Wendy said that when their mother came home, Misty ran to tell her she was bleeding but would not explain what had happened.  Wendy said that she found the nylon pantyhose that Misty had been wearing the night before, which were stained with blood in the crotch area, but she could not find her underpants or overalls.  Wendy said that she had not accused Reid of assaulting Misty, but Reid told her that her mother was accusing him of raping Misty.  Wendy described Reid as having a bad temper and said that he yelled at and pushed his girlfriend, and that he had yelled at her, but he had never assaulted her.

5.  **Arrest**

Officers Duffey and Ahern arrested Reid on the evening of June 21, 1986, without a warrant, just after he stopped at the

16

police station to file a complaint. Reid was charged with three counts of aggravated felonious sexual assault. Reid denied the crime and denied knowing anything about what had happened to Misty in the early morning of June 18, other than that at about 6:00 that morning he heard Misty tell her sister that she was bleeding. He said that he had been visiting with his girlfriend, Lisa Handyside, near her home in Auburn, trying to patch up their differences. He remembered that he got home at around 4:30 or 5:00 that morning.

The police interviewed Lisa Handyside after talking with Reid. Handyside reported that she had been living with Reid for about a year and a half and that they had a baby. She said that in the early morning of June 17, she and Reid fought, and she left, taking the baby to stay with her mother. Handyside said she applied for and was granted a restraining order against Reid. Handyside then gave two different stories about Reid's whereabouts during the early morning of June 18. When confronted with Wendy's statement that Reid was in his apartment at 2:00 a.m., Handyside said that Reid had told her to tell the police that he had been with her during that time because he did not have an alibi and had been out getting high that night. Handyside told the police that her first story, that she had stayed with her mother since the early morning of June 17 and did not see Reid during the early morning of June 18, was the truth.

17

### B. Procedural Background

A probable cause hearing was held in Manchester District Court on August 22, 1986. Officer Simmons testified. The court found probable cause to believe Reid assaulted Misty, and he was bound over for trial. On the same day, the grand jury returned an indictment charging Reid with three counts of aggravated felonious sexual assault. Before trial, Reid, both pro se and through counsel, filed five discovery motions seeking exculpatory materials from the state. Despite his requests, the state did not turn over Manchester Police Department reports related to the incidents in December 1985 and April 1986 that also involved allegations of sexual assault of Misty Price.

Reid represented himself at trial in July 1987, with the assistance of stand-by counsel. The prosecution's case against Reid rested largely on the testimony of Misty and her mother. Reid was convicted of two counts of aggravated felonious sexual assault but was acquitted of the third charge. Following his conviction in Hillsborough County Superior Court, Reid moved to set aside his convictions on grounds that the prosecution failed to disclose exculpatory material in violation of his rights to due process. Brady v. Maryland, 373 U.S. 83 (1963). He also sought a copy of DCYF records and Easter Seal School records pertaining to Misty. On July 22, 1988, the superior court ordered in camera inspection of the DCYF and school records, and ordered the state to provide Reid and his counsel with copies of other materials including any previous reports of sexual

18

molestation of Misty. The state then disclosed the December 1985 and April 1986 police reports regarding allegations of sexual assault involving Misty.

A hearing on Reid's motion to set aside his convictions was held on September 30, 1988. At the hearing, the state made an offer of proof that Officer Simmons, who filed the police reports regarding the December 1985 and April 1986 incidents, "testified and made reference to these prior incidents at the defendant's probable cause hearing." State v. Reid, Nos. S-86-1819, 1820, 1821 (N.H. Superior Court, Oct. 13, 1988). The court held that "[f]rom that time, the State was on notice that earlier reports existed. The State, not the defendant, had the obligation to provide the defendant with that evidence contained in those police reports." Id. Finding that the state improperly withheld exculpatory information (the police reports of the two prior incidents) in violation of Reid's constitutional rights, the court set aside his two convictions and ordered a new trial. Id. The two remaining charges against Reid were later nol prossed.

Reid then filed the present suit, alleging violations of his federal civil rights and asserting state law claims. Reid's civil case has progressed through discovery, three amended complaints, and defendants' dispositive motions. In February 1993, this court granted defendants' motion for summary judgment and entered judgment in favor of all remaining defendants. The court of appeals affirmed, except as to certain claims brought against the four defendant police officers. See Reid v. State of

19

New Hampshire, 56 F.3d 332 (1st Cir. 1995). With respect to the police officer defendants, the court of appeals vacated the judgment entered in their favor "on the false arrest, malicious prosecution, and due process claims, and remand[ed] all claims against the police defendants for further proceedings, including reasonable discovery." Id. at 343.

## DISCUSSION

Defendants now move for summary judgment on all remaining claims against them: state law claims of false arrest, malicious prosecution, and negligence; a federal due process claim, brought under 42 U.S.C.A. § 1983, alleging that defendants withheld exculpatory evidence; and a civil conspiracy claim. The analysis begins with Reid's federal due process claim.

A.    **Withholding Exculpatory Evidence:  Brady Claim**

Reid contends that Officer Simmons withheld exculpatory evidence: i.e. the two prior police reports pertaining to Misty and DCYF files on the Price family.[2] A prosecutor's constitutional duty to disclose exculpatory information to the defense in a criminal case was established in Brady v. Maryland, 373 U.S. 83 (1963). Since Brady, courts have recognized a

---

[2] As is discussed above, Reid has not pointed to any factual support in the record for his claim that defendants had the DCYF files in their possession or even had access to the files. Therefore, his claim against the named defendants for withholding exculpatory evidence cannot stand to the extent it relates to the DCYF files.

20

concomitant duty obligating police investigators to turn over exculpatory and impeachment evidence to the prosecutor. See Reid, 56 F.3d at 341; see also, e.g., McMillian v. Johnson, 88 F.3d 1554, 1566-67 (11th Cir. 1996) (collecting cases), modified on other grounds, 101 F.3d 1363, cert. denied, 117 S. Ct. 2514 (1997); Walker v. City of New York, 974 F.2d 293, 299 (2d Cir. 1992) (collecting cases); Robinson v. Winslow Township, 973 F. Supp. 461, 472 (D.N.J. 1997); Campbell v. State of Me., 632 F. Supp. 111, 121 (D. Me. 1985), aff'd, 787 F.2d 776 (1st Cir. 1986). A police officer, however, has no independent duty to disclose exculpatory or impeachment materials to a criminal defendant. Campbell, 632 F. Supp. at 121.

Reid has not shown in the record submitted here that Officer Simmons, or any of the named defendants, ever concealed or withheld the pertinent police reports. It is undisputed that Simmons openly discussed the two reports during the probable cause hearing in Reid's criminal case on August 22, 1986. See State v. Reid, Nos. S-86-1819, S-86-1820, S-86-1821 (N.H. Superior Ct. October 13, 1988). At least from that time, therefore, the state — the prosecutor — was on notice of the existence of the reports and the police had no further obligation to disclose. See McMillian, 88 F.3d at 1566.

Accordingly, since Reid has not shown any factual basis supportive of his claim that the police failed to disclose the police reports to the prosecution, and it is undisputed that the reports were disclosed to the state — the prosecutor — at the

21

probable cause hearing (thereby triggering the prosecution's obligation of disclosure under <u>Brady</u>), the named defendants are entitled to summary judgment with respect to Reid's <u>Brady</u> claim.

**B.   <u>False Arrest</u>**

To prove his state law false arrest claim, Reid must be able to show at trial that his arrest was invalid.  <u>See</u> <u>Hickox v. J.B. Morin Agency, Inc.</u>, 110 N.H. 438, 442-43 (1970).  Reid asserts that his arrest for sexually assaulting Misty Price was indeed invalid because defendants lacked probable cause to believe he had committed the assault. "Probable cause to arrest exists when the arresting officer has sufficient, trustworthy information to warrant a reasonable person to believe that the arrestee has committed a crime."  <u>State v. Vandebogart</u>, 139 N.H. 145, 163 (1994).  Information is sufficient for probable cause if it would support a reasonable probability that the arrestee has committed a crime, which is less than the amount of evidence necessary for conviction or to make a <u>prima</u> <u>facie</u> case.  <u>See</u> <u>State v. Jaroma</u>, 137 N.H. 562, 567 (1993).  In making a probable cause determination, the police are not expected to have any greater knowledge or understanding of the circumstances than would any person of reasonable prudence and caution in the same situation. <u>See</u> <u>Hartgers v. Town of Plaistow</u>, 141 N.H. 253, 256 (1996). Instead, "[t]he determination of probable cause must be viewed in the light of factual and practical considerations of everyday

life on which reasonable and prudent [people], not legal

technicians, act." <u>Jaroma</u>, 137 N.H. at 567 (quotation omitted).

Gordon Reid was arrested on three counts of aggravated

felonious sexual assault.[3]  At the time of his arrest, the

_____

[3]  The crime of aggravated felonious sexual assault consisted of the following pertinent offenses in 1986 when Reid was arrested:

A person is guilty of a class A felony if he engages in sexual penetration with another person under any of the following circumstances:

I.  When the actor overcomes the victim through the actual application of physical force, physical violence or superior physical strength.
II.  When the victim is physically helpless to resist.
III.  When the actor coerces the victim to submit by threatening to use physical violence or superior physical strength on the victim, and the victim believes that the actor has the present ability to execute these threats.
IV.  When the actor coerces the victim to submit by threatening to retaliate against the victim, or any other person, and the victim believes that the actor has the ability to execute these threats in the future.
V.  When the victim submits under circumstances involving false imprisonment, kidnaping or extortion.
VI.  When the actor, without the prior knowledge or consent of the victim, administers or has knowledge of another person administering to the victim any intoxicating substance which mentally incapacitates the victim.
VII.  When the actor engages in the medical treatment or examination of the victim in a manner or for purposes which are not medically recognized as ethical or acceptable.
VIII.  When, except as between legally married spouses, the victim is mentally defective and the actor knows or has reason to know that the victim is mentally defective.
IX.  When the actor through concealment or by the element of surprise is able to cause sexual penetration with the victim before the victim has an adequate chance to flee or resist.

N.H. Rev. St. Ann. § 632-A:2 (1989).

evening of June 21, 1986, the police were acting on information they had gathered from Misty Price; her mother, Ruth Price; her mother's friend, Patricia Cushing; Misty's sister, Wendy; and Misty's medical examination at CMC. The medical records and witness statements establish, and Reid does not dispute, that at the time of his arrest the police reasonably could have concluded that Misty Price had in fact been sexually assaulted on June 17 or 18. Reid instead argues that it was unreasonable for the police to believe or credit either Misty's or her mother's statements implicating him as the perpetrator. For that reason, Reid contends, the police lacked probable cause to arrest him for the crime.

When they arrested Reid, the police knew Misty's family had a troubled history that included accusations of physical and sexual abuse of Misty and her sister, Wendy. They knew that DCYF was involved with the family, given accusations of sexual and physical abuse. They also knew, based on their investigation of two prior incidents of reported sexual abuse involving Misty, that Misty had great difficulty in accurately describing what happened to her, and that she became confused and imaginative in her descriptions of incidents of abuse. During each investigation, Misty used anatomically correct dolls to demonstrate her explicit knowledge of sexual activity. The police concluded in a prior investigation that although Misty had been victimized sexually, she was not able to provide sufficient detail to identify her attacker, on that occasion. The police

24

also knew that Misty was in an Easter Seals educational program due to her learning difficulties. Reid says these circumstances should have led the police to entirely discount Misty's statements.

Reid argues that the police should also have known that Ruth Price's information was completely untrustworthy because she had a history of problems with her children, and risked DCYF intervention, including losing her children, if she continued to abuse them or expose them to abusive situations. Therefore, Reid argues, Ruth had a compelling motive to fabricate a story about what had happened. In addition, Reid points to certain inconsistencies in the information provided by Misty, Wendy, Ruth, and Patricia Cushing to support his argument that their stories were false and should not have been credited by the arresting officers.

While Misty's past history of sexual abuse and difficulties with communication might well have tended to cast some doubt on her descriptions of precisely how the assault occurred in June of 1986, there was little question that an assault did occur. The only question the police had to resolve before making an arrest was who probably assaulted Misty. The police had no reason to believe that Misty was falsely accusing Reid. There was no basis for concluding, as Reid suggests, that previously Misty had falsely accused someone named "Dan" of sexually assaulting her, in December of 1985. Instead, the police were simply not able to identify who the person Misty called "Dan" might have been.

25

Relative to the December 1985 incident, the police found Misty's descriptions to be confused and imaginative, but they did not conclude that she made false accusations. And, far from making false accusations, Misty and her mother actually denied the sexual assault reported by family friend Rosie Emmons in April of 1986.

While Reid's charge that Price had reason to shift blame from herself for Misty's condition has some validity, Price's story implicating Reid was not entirely exculpatory. Her story included the admission that she left her two daughters alone in Reid's apartment while she spent the night with a male friend. She did not return the next day until almost noon. Since the police and DCYF had previously warned Price that she was responsible for protecting her daughters from abuse, her actions, as she reported them, were far from blameless.

In addition, the police had other information that, despite some inconsistent details, corroborated Misty's story that Reid was the person who assaulted her. Wendy told the officers that she and Misty were alone in Reid's apartment on the night of June 17. Misty was in bed asleep, fully clothed and wearing her mother's pantyhose. Wendy said that Reid was at the apartment in the early morning on June 18 — that she saw him sitting on the end of the couch where she was sleeping. Wendy also said that Reid was in the apartment at six that morning when she was trying to bathe Misty. Wendy said that Reid was much nicer to Misty than usual, promising her toys if she would explain what had

26

happened. At that time, Misty would only say that "a little boy touched her." Misty later explained to the police that Reid had warned her not to tell or he would assault her again. Wendy told the police that Misty was very upset during the morning, that she "clutched to" Wendy and would not let her go.[4]

Patricia Cushing reported that when she arrived at the apartment that evening, Misty ran up to her crying and told her that "Gordy" had hurt and that she was bleeding.[5] Cushing picked up Misty, who was very upset and trembling. When Reid drove up in his car and stopped, Misty "put a choke hold on" Cushing and told her she did not want to go with Reid because he had hurt her. Misty also told Cushing that Reid was driving a different car than the one she was in with him when the assault occurred. Cushing told the police that Misty was behaving in a manner that revealed her fear of Reid.

When Officer Simmons gave Misty and Ruth a ride home after interviewing them on June 20, he drove by Reid's apartment house

---

[4] Reid disputes that Cushing and Officer Gilman found Misty's clean but damp underpants on a washing machine at his apartment. He says in an affidavit that he did not have a washing machine in his apartment, so the underpants could not have been found there. Whether or not a washing machine was in the apartment, or available for Reid's use in the apartment building, is not a material fact. The referenced underpants, wherever they were found, were not taken by the police because they were clean and not useful for forensic testing. Thus, the underpants are not considered in the probable cause analysis here.
The police did not obtain the forensic analysis of the blood in the pantyhose until after Reid's arrest.

[5] Any inconsistencies in descriptions of Cushing's arrival are immaterial.

to see if Misty could identify it.  Simmons noted that Misty was very reluctant to go near the house and almost cried, but she then pointed out where Gordon lived, and the bushes in the front yard where she said the assault occurred.  She again mentioned going "to the nearest lake" with Reid.

Misty's descriptions of the physical assault were fairly consistent and detailed.  She never changed her basic statement that Reid was the person who assaulted her.  Her descriptions of the location of the assault varied — sometimes she said the incident occurred in Reid's car (described as a red car with no back seat) in back of the house, sometimes she also described grass or bushes in his front yard, and several times she mentioned that he took her "to the nearest lake."  Misty, a learning disabled child, also gave different accounts in different tellings of how the assault ended.  Whether the inconsistencies were due to stress and confusion, the questions she was asked, different parts of a single assault, or fabrication, the officers could not know.

Based on all of the information the police had on June 21 when they arrested Reid, the police knew that Misty had been sexually assaulted, that she consistently and credibly identified Reid as her attacker, and demonstrated that she was afraid of him.  Nothing in Misty's descriptions of the incident, despite some of the inconsistent details, or in any other information discovered by the police, ruled Reid out as a suspect.  Reid also had every opportunity to commit the crime since he was in the

apartment with Misty during the time period when the assault likely occurred. The police also had their own observations of Misty and were aware of contemporaneous corroborating statements made by Misty to her mother, sister, and family friend.

Probable cause to arrest under applicable New Hampshire law means just that — a reasonable probability that the arrestee committed the crime based on the ordinary circumstances of everyday life. See Hartgers, 141 N.H. at 256. Probable cause to arrest does not mean that the police must be convinced, or have no doubt, that the arrestee committed the crime. Id. "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for mistakes on their part." Brinegar v. United States, 338 U.S. 160, 176 (1949). Thus a higher and less flexible standard for determining probable cause would "unduly hamper law enforcement." Id. "The law does not, and should not, allow recovery in tort by all persons accused of crimes and not convicted. There is no guarantee in our society that only guilty persons will be accused and arrested." McGranahan v. Dahar, 119 N.H. 758, 769 (1979) (citing Baker v. McCollan, 99 S. Ct. 2689, 2695 (1979)).

In this case, the police had a reasonably coherent and credible description of the assault that identified Reid as Misty's attacker. Nothing more is required to support probable cause to arrest. See, e.g., Brodnicki v. City of Omaha, 75 F. 3d 1261, 1264-65 (8th Cir. 1996). Accordingly, the undisputed facts

presented in the record demonstrate that, when the police arrested Reid, they had probable cause to arrest him for sexually assaulting Misty.  Because Reid has not presented any trialworthy issue with respect to the validity of his arrest, and it was valid as a matter of law, defendants are entitled to summary judgment on his state false arrest claim.[6]

## C.   **Malicious Prosecution**

To prove a claim of malicious prosecution at trial, plaintiff must show "that the defendant was instrumental in initiating the criminal charges; that the plaintiff was acquitted or otherwise successful on the merits; that the defendant acted

_____

[6] As noted previously, the court of appeals construed Reid's false arrest claim (which he brought under 42 U.S.C.A. § 1983) as a due process claim and held that because New Hampshire recognizes the tort of false arrest, the claim should have been addressed under state, not federal, law. Reid, 56 F.3d at 341.  The appeals court's ruling is somewhat confusing given the fact that Reid also alleged a Fourth Amendment violation — the court of appeals may have intended to recognize false arrest claims under both the Fourth Amendment and state law, or it may have interpreted Reid's complaint as raising only a due process false arrest claim.  See, e.g., Abraham v. Nagle, 116 F.3d 11, 13 (1st Cir. 1997) (recognizing false arrest claim under both § 1983 and state law); Logue v. Dore, 103 F.3d 1040, 1043-44 (1st Cir. 1997) (false arrest claim under Fourth Amendment); but see Taylor v. Meacham, 82 F.3d 1556, 1561 (10th Cir.) (suggesting that the First Circuit held in Reid that neither malicious prosecution nor false arrest claims are cognizable under § 1983), cert. denied, 117 S. Ct. 186 (1996).  In the event that Reid intended a Fourth Amendment claim, this court's decision with respect to that claim in its first summary judgment order was not vacated on appeal and remains in effect.  Furthermore, even if a Fourth Amendment false arrest claim were to be considered again here, the court holds that defendants are entitled to summary judgment on such a claim as well, since the record shows no trialworthy issue as to probable cause at the time of Reid's arrest, and, as a matter of law, the police did have probable cause to arrest Reid.  See Abraham, 116 F.3d at 13.

with malice, that is, with a purpose other than bringing a suspected offender to justice; and that the defendant lacked probable cause to believe that the plaintiff had committed acts constituting a crime." McGranahan, 119 N.H. at 769; see also ERG v. Barnes, 137 N.H. 186, 190 (1993). Lack of probable cause is an essential element of a malicious prosecution claim. Johnston v. Flatley Realty Investors, 125 N.H. 133, 136 (1984).

Reid has not pointed to evidence in the record tending to show that the defendants acted with malice in arresting him. In addition, Reid has not shown that defendants lacked probable cause to arrest him.[7] Since Reid has not demonstrated a trialworthy factual issue as to two elements essential to succeed in a claim of malicious prosecution, defendants are entitled to summary judgment, as a matter of law, on that claim.

## D. **Negligence**

Reid contends that defendants had a duty, because of their knowledge of Misty's functional limitations and her family's history, to further investigate the crime before arresting him.

---

[7] Since the court has determined that as a matter of law probable cause existed at the time of Reid's arrest, it is not necessary to consider the effect of the subsequent probable cause determination by the state district court, or the grand jury indictment on August 22, 1986. Cf., e.g., Riley v. City of Montgomery, 104 F.3d 1247, 1253 (11th Cir. 1997) (grand jury indictment is prima facie evidence of probable cause); Coogan v. City of Wixom, 820 F.2d 170, 175 (6th Cir. 1987) (plaintiff collaterally estopped from raising malicious prosecution claim after court bound him over following contested probable cause hearing).

31

The court has determined, however, that based on the record presented here, as a matter of law defendants had probable cause to arrest Reid for sexually assaulting Misty Price. Thus, Reid cannot maintain a claim for defendants' negligent failure to investigate before his arrest. See, e.g., Franco-De Jerez v. Burgos, 876 F.2d 1038, 1042 (1st Cir. 1989) (no duty to investigate after a determination of probable cause to arrest); see also Romero v. Fay, 45 F.3d 1472, 1476-77 (10th Cir. 1995) (collecting cases discussing police duty to investigate prior to arrest). Accordingly, as defendants were not negligent in their investigation, and had probable cause as a matter of law, they are entitled to summary judgment on Reid's negligence claim.

## E. Conspiracy

Reid contends that defendants engaged in a civil rights conspiracy to conceal exculpatory information from him during his criminal prosecution. "A civil rights conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Santiago v. Fenton, 891 F.2d 373, 389 (1st Cir. 1989) (quotations omitted). Thus, in addition to a conspiratorial agreement, plaintiff must show "an actual deprivation of a right secured by the Constitution and laws." Earle v. Benoit, 850 F.2d 836, 845 (1st Cir. 1988) (quotation

32

omitted). Since Reid has not shown that he has a <u>viable civil rights claim</u> against defendants, they are entitled to summary judgment on his civil rights conspiracy claim as a matter of law.

Although the theory was not alleged or argued here, if Reid's civil conspiracy claim were interpreted as alleging a conspiracy between the police defendants and prosecutors to withhold exculpatory evidence, the record contains no evidence, direct or circumstantial, suggesting any such agreement. Accordingly, a claim based on that theory would also fail.

In addition, if Reid intended his claim as a state law civil conspiracy claim, it would fail for the same reasons that the civil rights claim fails. Reid has not shown that defendants, together or with others, combined "to accomplish an unlawful purpose, or to accomplish some purpose not in itself unlawful by unlawful means." <u>Jay Edwards, Inc. v. Baker</u>, 130 N.H. 41, 47 (1987) (quotation omitted). Under New Hampshire law, a civil conspiracy does not exist unless there is "an underlying tort which the alleged conspirators agreed to commit." <u>University System of N.H. v. United States Gypsum Co.</u>, 756 F. Supp. 640, 652 (D.N.H. 1991). Reid has pointed to no evidence in this record that would allow a reasonable jury to find that defendants agreed to commit a tort against him. Defendants are also entitled to summary judgment with respect to Reid's civil conspiracy claim.

The record presented for summary judgment, taken in the light most favorable to Reid, shows no genuine dispute as to any material facts that would require trial of Reid's claims. On

33

each claim, the undisputed material facts of record establish that defendants are entitled to judgment as a matter of law. Accordingly, it is not necessary to consider Reid's motion for summary judgment in his favor.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (document no. 245) is granted. Plaintiff's motion for summary judgment (document no. 251) is denied. The clerk of court is instructed to enter judgment in favor of the defendants, in accordance with the terms of this order, and close the case.

**SO ORDERED.**

```
_____
```
Steven J. McAuliffe
United States District Judge

March 6, 1998

cc:  Robert G. Whaland, Esq.
     Gordon C. Reid
     Ann F. Larney, Esq.