United States Court of Appeals
For the First Circuit

No. 98-2370

NEW YORK STATE DAIRY FOODS, INC., ET AL.,

Plaintiffs, Appellants,

v.

NORTHEAST DAIRY COMPACT COMMISSION, ET AL.,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Selya, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lipez, Circuit Judge.

Stuart I. Friedman, with whom Mary H. Dontzin, David O. Lloyd
and Friedman, Wittenstein & Hochman, were on brief for Farmland
Dairies, Inc., appellant.
Sheldon A. Weiss, for Cumberland Farms, Inc., appellant.
John J. Vetne, for New York State Dairy Foods, Inc., Crowley
Foods, Inc., and Elmhurst Dairy, Inc., appellants.
Clifford M. Sloan, with whom Michael A. Rotker, Wiley, Rein &
Fielding, and Dixie Henry, General Counsel, Northeast Dairy Compact
Commission, were on brief for appellees.

November 30, 1999

BOWNES, Senior Circuit Judge. Appellants, New York State
Dairy Foods, Inc., Crowley Foods, Inc., Cumberland Farms, Inc.,
Elmhurst Dairy, Inc., Farmland Dairies, Inc., Stewart's Ice Cream,
Inc., Stewart's Processing Corp., and Sunnyvale Farms, Inc., appeal
from the district court's grant of summary judgment on their
challenges to certain regulations promulgated by appellee,
Northeast Dairy Compact Commission ("Commission"), with Kenneth M.
Becker, executive director of the Commission. Appellants argue
that the Commission exceeded its regulatory power under the
Northeast Interstate Dairy Compact, that it violated the Dormant
Commerce Clause, and that it violated their due process rights. 
For reasons stated below, we affirm.
I. FACTS
On this appeal from the grant of summary judgment in
favor of appellees, we recite the facts in the light most favorable
to the appellants. See Aponte Matos v. Toledo Davila, 135 F.3d
182, 185 (1st Cir. 1998); Acosta-Orozco v. Rodriguez-de-Rivera, 132
F.3d 97, 98 (1st Cir. 1997).
A. The Parties
Appellant New York State Dairy Foods, Inc. is a non-
profit trade association representing New York milk processors and
distributors of fluid milk products. It is joined by five fluid
milk processors and distributors that procure raw milk from dairy
farms outside of New England and distribute fluid milk in New
England, and two New York processors that purchase raw milk from
dairy farms outside of New England but do not distribute within New
England. 
Appellee, the Northeast Dairy Compact Commission,
administers the Northeast Interstate Dairy Compact (the
"Compact"), an agreement entered into by the six New England
states and approved by the Congress. See 1996 Farm Bill, 7 U.S.C.
7256 (1996). The Commission's primary purpose is to regulate
milk prices in the signatory states. 
B. The Compact
Under the terms of the Compact, each state must appoint
a delegation to the Compact Commission consisting of between three
and five members. See Compact 4. The delegation must include at
least one dairy farmer and one consumer representative. See id. 
At the time this suit began, the Commission included directors of
Women, Infants and Children's programs of various states, the Rhode
Island Attorney General's Chief of the Consumer Protection
Division, and state Agricultural Commissioners. Delegation members
may not serve more than three consecutive terms, and no term may be
more than four years. They may be removed from the Commission for
cause. The delegation members' compensation is determined and paid
by the individual states, although the Commission pays their
expenses. See Compact 4. 
Historically, the dairy industry has been subject to
extensive regulation by the federal government. Under the
Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, as
amended, 7 U.S.C. 601 et seq. (1933), the Secretary of
Agriculture may set minimum prices that milk "handlers"
(processors) pay to "producers" (farmers) for raw milk. These
"Federal Milk Marketing Orders" vary according to class of milk;
the highest prices are charged for "Class I," fluid use milk. See
generally West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 188-89
& n.1 (1994) (describing regulatory scheme). The primary purpose
of the Compact is to set "over-order" prices in the Compact states,
i.e., minimum prices at some level above those mandated by the
federal pricing orders. See Compact 2(8), 9(b).
The Commission exercises broad authority, through notice
and comment rulemaking, to set minimum prices that processors pay
for milk distributed within the Compact region. See Compact 8-
10. Each party state has a single vote, see Compact 4, and price
regulations must be approved by two-thirds of all party states. A
state that dissents from a price regulation is not bound by it. 
See Compact 5. 
The Commission's over-order pricing power applies to two
kinds of Class I milk processors: "pool plants" and "partially
regulated plants." "Pool plants" are milk plants physically
located within the Compact region. "Partially regulated plants"
are plants that, while located outside the regulated area,
distribute Class I milk within the area, or receive milk from
producers in the area. The Commission's powers with respect to
minimum prices for pool plants and partially regulated plants are
coextensive. See Compact 9(d) ("The commission is hereby
empowered to establish the minimum price for milk to be paid by
pool plants, partially regulated plants and all other handlers
receiving milk from producers located in a regulated area."). 
The terms of the Compact allow milk processors to object
to the over-order price regulation. See Compact 16(b). Handlers
may file a written petition and request a hearing with the
Commission. See id.; see also 7 C.F.R. 1381.1-1381.4(f) (1997). 
The Chair of the Commission must appoint a hearing panel of one to
three Commission members to pass on this petition. The panel must
be composed of "Commission members who are not members of the state
delegation in which the Handler is incorporated or has its
principal place of business, who have no pecuniary interest in the
outcome, and who are otherwise fair and impartial." 7 C.F.R. at
1381.4(a). After considering the petition, the hearing panel
issues a proposed decision, and, after considering handlers'
objections, issues a ruling. See id. at 1381.4(g)-(h). The
Commission itself then reviews this ruling and issues its own
decision. See id. The regulations further dictate that:
Any commissioner shall (on either the Commissioner's own
motion or on motion of the petitioner) disqualify himself
or herself from consideration of the Commission's final
ruling on the panel's decision if that commissioner's
impartiality might reasonably be questioned. 

See id. at 1381.4(h)(3). 

The essence of the Commission's regulatory scheme is its
"pooling mechanism." All handlers, whether pool plants or
partially regulated ones, pay the same amount per hundredweight
(cwt) into the pool, according to the volume of Class I milk
purchased. See 7 C.F.R. 1306.1. Thereafter, they receive
rebates from the pool. While pool plants receive a rebate based on
the volume of all milk sold, whether Class I, II, or III, and
whether sold in the Compact region or elsewhere, partially
regulated plants receive payment based solely on Class I milk
distributed in the Compact region. See 7 C.F.R. 1304.5(c)(1),
1307.4(f). These rebates are not retained by the plants, but
rather are returned to the dairy farmers. See New York State Dairy
Foods, Inc., 26 F. Supp. 2d at 256-57 ("This money would be
collected and commingled in the producer-settlement fund, along
with all payment obligations of all other regulated handlers, for
distribution to producers. The Commission would disburse from the
pool to dairy farmers through the handlers, acting in a conduit
capacity."). 
It is this rebate system that appellants claim
disadvantages them. Appellants claim that New York dairy farmers
receive a higher payback from, and therefore prefer to conduct
business with, New England pool plants. This, appellants assert,
causes them to suffer competitive harm.
II. PROCEEDINGS BELOW
A. Issuance of the Regulation 
On May 30, 1997, the Commission adopted an over-order
price regulation effective from July 1, 1997, to December 31, 1997. 
See 7 C.F.R. 1300-08, 1381 (1997). After the requisite notice
in the Federal Register and subsequent public hearings, the six
member states voted unanimously in favor of the regulation. 
Similarly, the regulation passed the producer referendum
overwhelmingly. See Northeast Dairy Compact Commission, Results of
Producer Referendum on Compact Over-Order Price Regulation, 62 Fed.
Reg. 29,646, 29,647 (May 30, 1997).
The regulation established an over-order price of $16.94
per hundredweight. See Compact Over-order Class I Price and
Compact Over-order Obligation, 7 C.F.R. 1305.1 (1997). At the
time of adoption, the federally mandated minimum price was $13.94,
resulting in an over-order obligation of $3.00 per hundredweight. 
As the federal Class I price increased, the over-order obligation
decreased in order to keep the net price constant at $16.94 per
hundredweight. The Commission applied this over-order price
regulation to all Class I fluid milk distributed within the
regulated area, including milk produced and processed outside the
region by partially regulated plants. 
The over-order price regulation included an additional
assessment of $.032 per hundredweight. The Compact explicitly
grants this authority to the Commission to recover its
administrative costs. See Compact 18(a) ("[I]f regulations
establishing an over-order price or a compact marketing order are
adopted, they may include an assessment for the specific purpose of
their administration."). The Commission applied this assessment to
all fluid milk products distributed in the regulated area, whether
by pool plants or partially regulated plants. See 7 C.F.R.
1308.1 (1997). 
B. The Administrative Petitions 
On August 15, 1997, a subset of the instant appellants,
led by Crowley Foods, Inc., filed administrative petitions (the
"Crowley petitions") with the Commission that raised three
variegated challenges, all of which are at issue in this appeal. 
First, they challenged the lawfulness of the pricing regulations. 
Second, they challenged the inclusion of a producer representative
in each state's delegation to the Commission. Third, they
challenged the participation on the Hearing Panel by any Commission
member who had participated in promulgating the regulations under
dispute. Finally, they challenged the imposition of the
administrative assessments on out-of-region handlers. 
In response to these challenges, the Chair of the
Commission appointed three Commission members to serve as the
hearing panel. The panel was comprised of the Chair, who was also
the consumer representative from the Maine delegation, the Chief of
the Consumer Protection Division of the Rhode Island Attorney
General's Office, and the consumer representative from the New
Hampshire delegation. See New York State Dairy Foods, Inc., 26 F.
Supp. 2d at 258. As the Commission's regulations require, none of
the hearing panel members were from a state in which any petitioner
was incorporated or has its principal place of business. See id. 
The panel issued a Proposed Decision on September 9,
1997, recommending that the Commission deny the claims raised. Ten
days later, the petitioners filed written objections. On
September 23, the panel issued its Final Proposed Decision. The
Commission adopted this final proposed decision by a 6-0 vote. See
id. The Commission held that: (1) it has the authority to
regulate (by imposing an over-order price and administrative
assessment on all pool and partially regulated handlers) all milk
distributed in the New England region, regardless of where it is
produced; (2) application of the over-order pricing and pooling
regulation to partially regulated plants does not constitute an
impermissible compensatory payment scheme; and (3) the
participation of New England farmers and processors in setting the
over-order price does not, absent specific allegations of bias,
violate the Due Process Clause. See New York State Dairy Foods,
Inc., 26 F. Supp. 2d at 258, citing In re Crowley Foods, Inc., Nos.
HEP-97-001, -002, -004 & -005, at 9-20, 24-27. 
Simultaneously, appellant Elmhurst Dairy, Inc., joined by
Byrne Dairy, Inc., filed its own administrative petition (the
"Elmhurst petition") raising claims similar to the Crowley
petitions. In addition, the Elmhurst petition claimed that the
pricing regulations were unlawful as applied to Elmhurst because
its distribution within the regulated area was solely through an
unaffiliated distributor. The Chair of the Commission appointed
the same hearing panel that heard the Crowley petitions to hear the
Elmhurst petition. On October 15, 1997, the panel once again
issued a proposed decision recommending that the Commission reject
all claims. The Elmhurst petitioners failed to file objections,
and the proposed decision became final. On December 3, 1997, the
Commission, again by a 6-0 vote, adopted the panel's recommendation
and rejected all claims. It specifically rejected the claim that
Elmhurst was not subject to the regulation because it found that
the interposition of a third-party intermediary did not change the
fact that Elmhurst "'operates a partially regulated plant that
receives milk from producers providing the raw supply' for sales of
packaged milk in the region." New York State Dairy Foods, Inc., 26
F. Supp. 2d at 258 (citing In re Elmhurst Dairy, Inc., Nos. HEP-97-
007 & -008, at 8-9).
C. The District Court 
Both the Elmhurst and Crowley petitioners sought review
in the district court, under its equity jurisdiction, to determine
whether the rulings of the Commission were "in accordance with
law." New York State Dairy Foods, Inc., 26 F. Supp. 2d at 259. 
Section 16(c) of the Compact grants such authority. 
The district court granted summary judgment in favor of
the Commission, holding that:
(1) The Commission did not violate the Commerce Clause
because Congress consented to the Commission's actions. See New
York State Dairy Foods, Inc., 26 F. Supp. 2d at 262.
(2) The Commission's actions did not violate Condition 7
of the congressional consent. See id.
(3) The administrative assessment contained in the over-
order price regulation was squarely authorized by the Compact. See
id. at 263. 
(4) Neither the composition of the hearing panel nor the
composition of the Commission violated due process. See id. at
263-64.
(5) The plaintiffs were required to exhaust their
administrative remedies on all claims before bringing them to the
district court. See id. at 259.
(6) The administrative assessment did not violate the
Equal Protection Clause of the United States Constitution. See id.
at 263.
(7) The Commission had authority to impose prices and
assessments on Elmhurst Dairy, Inc., despite the fact that its only 
connection with the Compact is through an unaffiliated distributor. 
See id. at 265. 
The several appellants challenge each of these rulings,
save the last two, both of which appear to have been abandoned on
appeal. 
In addition, the district court entered an order
approving an escrow account, in which any producer price payment
from plaintiff-appellants would be deposited. See New York State
Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n, No. 97-11576-
PBS (D. Mass. Aug. 14, 1997) (order approving escrow of funds).
III. STANDARD OF REVIEW
Our review of the district court's decision is de novo. 
See Siegal v. American Honda Motor Co., 921 F.2d 15, 17 (1st Cir.
1990). This is equally true of both the due process claims, see
Dominique v. Weld, 73 F.3d 1156, 1158 (1st Cir. 1998), and
questions of statutory interpretation. See United States v. George
Hyman Constr. Co., 131 F.3d 28, 31 (1st Cir. 1997) ("We review de
novo questions of statutory interpretation that present pure
questions of law."). 
IV. COMMERCE CLAUSE
Appellants launch a frontal assault on the over-order
pricing regime (with its attendant pooling mechanism and
administrative assessment) based on the Commerce Clause, or more
precisely, on the so-called "Dormant Commerce Clause." See U.S.
Const. art. I 8; South-Central Timber Dev., Inc. v. Wunnicke, 467
U.S. 82, 97 (1984); United Egg Producers v. Department of Agric.,
77 F.3d 567, 569-70 (1st Cir. 1996) ("The Supreme Court has
interpreted this affirmative grant of authority to Congress as also
establishing what has come to be called the Dormant Commerce Clause
a self-executing limitation on state authority to enact laws
imposing substantial burdens on interstate commerce even in the
absence of Congressional action."). 
Appellants' claim is based on the indisputable truism
that "[s]tate laws discriminating against interstate commerce are
virtually per se invalid." Fulton Corp. v. Faulkner, 516 U.S. 325,
331 (1996) (internal quotation marks omitted). As the Supreme
Court wrote in Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 527
(1935):
Neither the power to tax nor the police power may be used
by the state of destination with the aim and effect of
establishing an economic barrier against competition with
the products of another state or the labor of its
residents. Restrictions so contrived are an unreasonable
clog upon the mobility of commerce. They set up what is
equivalent to a rampart of customs duties designed to
neutralize advantages belonging to the place of origin.

Despite this seeming foundation of bedrock, appellants' Commerce
Clause challenge is ultimately based on little more than shifting
sand. This case, as distinct from Baldwin and the more recent West
Lynn Creamery, Inc. v. Healy, 512 U.S. 186 (1994) (striking down
state milk pricing scheme as a violation of Commerce Clause),
involves an affirmative congressional consent. 
There can be no dispute in this case that Congress
expressly consented to the Compact. See Northeast Interstate Dairy
Compact, 7 U.S.C. 7256 (1996) ("Congress hereby consents to the
Northeast Interstate Dairy Compact . . . .") (hereinafter "the
consent"). The question at issue is the scope of this consent.

A. Congressional Consent in General
Congress undoubtedly has the power to regulate milk
prices, see West Lynn Creamery, 512 U.S. at 192 ("The Commerce
Clause vests Congress with ample power to enact legislation
providing for the regulation of prices paid to farmers for their
products"), and can grant that power to the states, see Northeast
Bancorp v. Board of Governors, 472 U.S. 159, 174 (1985) ("When
Congress so chooses, state actions which it plainly authorizes are
invulnerable to constitutional attack under the Commerce Clause."). 
The relevant initial question, then, is not whether the Compact
violates the Commerce Clause. Instead, the starting point of the
inquiry is whether Congress consented to the actions of the
Commission. We hold that Congress has provided such consent.
The standard for finding congressional consent is high. 
Such consent must be either "expressly stated," Sporhase v.
Nebraska ex rel. Douglas, 458 U.S. 941, 960 (1982), or "made
unmistakably clear," South-Central, 467 U.S. at 91. See also
United Egg Producers, 77 F.3d at 570 (quoting both Sporhase and
South-Central). The statute or legislative history relied on as
consent must "evince[] a congressional intent to alter the limits
of state power otherwise imposed by the Commerce Clause." New
England Power Co. v. New Hampshire, 455 U.S. 331, 341 (1982)
(internal quotation marks omitted). The burden of showing consent
lies with the Commission. See Wyoming v. Oklahoma, 502 U.S. 437,
458 (1992) (imposing burden on discriminating state). 
We are called, then, to decide whether Congress's consent
grants the Commission the power to undertake the regulatory action
at issue in this case. Because the consent altering the limits
imposed by the Commerce Clause must be clear, our inquiry is
limited to determining whether Congress spoke "directly . . . to
the precise issue in question." See Chevron U.S.A., Inc. v.
National Resources Defense Council, Inc., 467 U.S. 837, 842-43
(1984). 
We have previously held that, in conducting this inquiry,
"courts must look primarily to the plain meaning of the statute,
drawing its essence from the particular statutory language at
issue, as well as the language and design of the statute as a
whole." Strickland v. Commissioner, Dep't of Human Servs., 48 F.3d
12, 16 (1st Cir. 1995) (internal quotation marks omitted). With
this in mind, we consider appellants' specific claims seriatim.
1. Congressional Consent to Regulation of
Handlers Outside the Region

Appellants first argue that the Compact and its attendant
consent allows the Commission to regulate only those handlers who
receive milk produced within the Compact region. We do not agree. 
The Compact specifically authorizes the Commission to regulate the
"pricing and pooling of milk handled by partially regulated
plants." Compact 10(7). Under the terms of the Compact, a
partially regulated plant is one that is not located within the
regulated area but distributes Class I milk within such area, or
receives milk from producers within the area. See Compact 2(7). 
The Compact further provides that "[t]he Commission is hereby
empowered to establish the minimum price for milk to be paid by
pool plants, partially regulated plants and all other handlers
receiving milk from producers located in a regulated area." 
Compact 9(d). 
Appellants seize on this last provision, arguing that the
lack of a serial comma after "partially regulated plants" and
before "and all other handlers" suggests that the latter modifies
the former. In other words, appellants contend that the Commission
may only establish a minimum price for milk handled by a partially
regulated plant when it receives milk from producers located within
the regulated area. The district court rejected this argument,
noting that "[s]uch an interpretation would exempt from regulation
those plants that meet the first half of the disjunctive definition
of a partially regulated plant in section 2(7) of the Compact." 
See New York State Dairy Foods, Inc., 26 F. Supp. 2d at 261. The
district court found this construction to be contrary to the logic
of the Compact, and we agree. Failure to construe the statute in
this way would leave a gaping hole in the regulatory regime. See
United States v. Carroll, 105 F.3d 740, 744 (1st Cir. 1997)
("Wherever possible, statutes should be construed in a commonsense
manner, honoring plain meaning, and avoiding absurd or counter-
intuitive results.") (internal citations omitted).
2. Condition 7
Appellants' better argument is based on Condition 7 of
the congressional consent, which states: "The Compact Commission
shall not use compensatory payments under section 10(6) of the
Compact as a barrier to the entry of milk into the Compact region
or for any other purpose." 7 U.S.C. 7256(7) (1996). Appellants
urge that the pooling mechanism utilized by the Commission in its
over-order pricing regulation amounts to a compensatory payment,
thus violating the congressional consent. The linchpin of this
argument is that because the differential payments paid back to
producers (through the handlers) depend on whether the handlers are
pool plants, the pooling mechanism is in effect a subsidy and
compensatory payment which is a barrier to the entry of milk into
the Compact region. 
Congress's command that "[t]he Compact Commission shall
not use compensatory payments under section 10(6) of the Compact as
a barrier to the entry of milk into the Compact region or for any
other purpose" is not all Congress had to say on the matter. The
next sentence states: "Establishment of a Compact over-order
price, in itself, shall not be considered a compensatory payment or
a limitation or prohibition in the marketing of milk." 7 U.S.C.
7256(7). The Commission rightly urges that these two sentences
read together mean that the Commission may do virtually anything
(within the contemplation of the Compact) with respect to over-
order pricing, short of compensatory payments. 
Both the Commission and the district court distinguished
between compensatory payments and pool payments. The former
involves a system not unlike the pool method at issue in the
instant case, save one crucial factor: under a compensatory
payment system, the partially regulated plants would receive no
disbursements whatsoever from the pool. See 7 C.F.R.
1304.5(c)(1), 1307.4(f). This distinction is vital, because it
eliminates the primary objection to compensatory payments. A
compensatory payment system forces handlers outside the pool to pay
what amounts to a tariff upon entry into the regulated area. See
Lehigh Valley Coop. Farmers, Inc. v. United States, 370 U.S. 76,
83-90 (1962) (striking down a compensatory payment system and
describing the above as the primary purpose and effect of a
compensatory payment system); see also New York State Dairy Foods,
Inc., 26 F. Supp. 2d at 262 n.10 ("This description is consistent
with the use of the term 'compensatory payment' in the case law
cited by the plaintiffs.")(citing Lehigh Valley Coop. Farmers,
Inc., 370 U.S. at 82, and Farmland Dairies v. McGuire, 789 F. Supp.
1243, 1247-48 (S.D.N.Y. 1992)). The pool payment mechanism, on the
other hand, does not bar the entry of milk from outside the Compact
region. Rather, by allowing for payments back to the out-of-
compact producers for Class I milk distributed inside the Compact
region, the over-order price could be said to encourage the entry
of such milk. 
Admittedly, pool plants and partially regulated plants
are not treated with absolute similitude; while pool plants receive
a rebate based on the volume of all milk sold, whether Class I, II,
or III, and whether sold in the Compact region or elsewhere,
partially regulated plants receive payment based only on Class I
milk distributed in the Compact region. See 7 C.F.R.
1304.5(c)(1), 1307.4(f). 
Even if there were to be some effect on entry of outside
milk or some competitive disadvantage, the fact remains that
Congress barred only the peculiar regulatory device of compensatory
payments. From the language of the Compact, it appears that
Congress distinguished between compensatory payments under 10(6),
which Congress barred, and "pricing and pooling of milk" under
10(7), which Congress allowed. 
We are left to conclude that Congress's language on the
authority of the Commission to regulate via the pooling mechanism
is clear. Admittedly, Congress could have outlined the very regime
the Commission implemented and approved it explicitly. Congress's
failure to do so, however, does not render its intent ambiguous. 
Cognizant of its inability to foresee every possible regulatory
action, Congress chose to prohibit one action and allow all others.
3. Administrative Assessment
Appellants next argue that the Commission exceeded its
authority (and therefore the scope of consent) by imposing an
administrative assessment on all handlers distributing Class I milk
in New England regardless of the point of origin of the milk. See
7 C.F.R. 1308.1. We also reject this contention. The Compact
explicitly gives the Commission the authority to include an
administrative assessment as part of an over-order price
regulation. See Compact 18(a) ("[I]f regulations establishing an
over-order price or a compact marketing order are adopted, they may
include an assessment for the specific purpose of their
administration."). Because the Commission's over-order pricing
authority extends to partially-regulated plants, its assessment
authority does as well.
B. Finding of Consent
Because we hold that in all respects the Commission acted
pursuant to the terms of the congressional consent, we determine
next whether that consent meets the high standard mandated by the
Constitution. See Sporhase, 458 U.S. at 960 (must be "expressly
stated"); South-Central, 467 U.S. at 91 (must be "made unmistakably
clear"). The failure of Congress to expressly state that the
Commission may take the challenged actions is not fatal. As the
Supreme Court stated in South Central:
There is no talismanic significance to the phrase
"expressly stated," however; it merely states one way of
meeting the requirement that for a state regulation to be
removed from the reach of the dormant Commerce Clause,
congressional intent must be unmistakably clear. The
requirement that Congress affirmatively contemplate
otherwise invalid state legislation is mandated by the
policies underlying dormant Commerce Clause doctrine.

South Central, 467 U.S. at 91-92. 
In the instant case, there is no question that Congress
affirmatively contemplated otherwise invalid state legislation. 
Congress explicitly consented to the Compact, marking in Condition
7 the boundaries of the Commission's power. This demonstrates
conclusively that Congress read the Compact, and rejected one
possible exercise of power, thereby approving the others contained
therein. 
This Court's decision in United Egg Producers v.
Department of Agriculture, 77 F.3d 567 (1st Cir. 1996), is not
inconsistent with our holding today. In that case, we considered
a regulation by the Commonwealth of Puerto Rico that all eggs
imported into Puerto Rico from the mainland United States bear a
stamp showing the two-letter postal code of the state of origin. 
See id. at 569. Puerto Rico argued that Congress had consented to
its action by stating: "[N]o State or local jurisdiction other
than those in noncontiguous areas of the United States may require
labeling to show the State or other geographical area of production
or origin." 21 U.S.C. 1052(b)(2), as quoted in United Egg
Producers, 77 F.3d at 569. In considering whether this met the
high standard of consent to state regulation of interstate
commerce, we reasoned:
One can argue that as Congress had before it the whole
subject of egg-labeling, its exemption of noncontiguous
jurisdictions must be understood to signify, by
implication, Congressional approval of any and all egg-
labeling requirements in those places regardless whether
justified or unjustified by Dormant Commerce Clause
considerations. But this seems to us a more extreme
reading than either the statutory language or legislative
history necessitates. Absent, at least, an affirmatively
stated grant of permission to noncontiguous jurisdictions
of the United States to require egg-labeling, we are
unable to conclude that appellants have met their burden
of showing that Congress' intent to allow Puerto Rico to
enact protectionist egg-labeling regulations was
"unmistakably clear."

United Egg Producers, 77 F.3d at 570-71 (footnotes omitted). 
This case is fundamentally different. This is not a case
in which an "affirmatively stated grant of permission" is lacking. 
Undoubtedly in part due to the peculiar nature of this case as one
involving both the Dormant Commerce Clause and the Compacts
Clause, Congress has provided affirmative consent; Congress read
the Compact and approved it. See Central Midwest Interstate Low-
Level Waste v. Pena, 113 F.3d 1468, 1470 (7th Cir. 1997) (assuming
that ratification of an interstate compact by Congress obviated the
need for Dormant Commerce Clause scrutiny). Accordingly, United
Egg Producers, while instructive, is not precisely apposite. 
V. DUE PROCESS
Appellants urge that the composition of both the
Commission and the Hearing Panel violates the Due Process Clauses
of both the Fifth and Fourteenth Amendments. They argue that the
commissioners who are dairy farmers or handlers have a pecuniary
interest in ruling and legislating against them. 
A. In General
The Supreme Court has long held that a "fair trial in a
fair tribunal is a basic requirement of due process." In re
Murchison, 349 U.S. 133, 136 (1955). This basic requirement
applies in the context of administrative agencies. See Gibson v.
Berryhill, 411 U.S. 564, 579 (1973). 
When an adjudicator has a direct, personal, and
substantial pecuniary interest in the outcome of a case, due
process is abrogated. See Tumey v. Ohio, 273 U.S. 510, 523 (1927). 
Not every interest, however, is substantial enough to amount to a
violation of due process. In one formulation, an interest is
substantial if it "would offer a possible temptation to the average
. . . judge to . . . lead him not to hold the balance nice, clear
and true . . . ." Ward v. Village of Monroeville, 409 U.S. 57, 60
(1972); see also Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 822
(1986). Participation of adjudicators who "might conceivably have
had a slight pecuniary interest," however, does not offend due
process. See Aetna Life Ins. Co., 475 U.S. at 825. 
The Due Process Clause sets a significantly lower bar for
legislative functions. Compare Londoner v. Denver, 210 U.S. 373
(1908), with Bi-Metallic Inv. Co. v. State Bd. of Equalization, 239
U.S. 441 (1915); see also Concerned Citizens of S. Ohio, Inc. v.
Pine Creek Conservancy Dist., 429 U.S. 651, 657 (1977) (Rehnquist,
J., dissenting) ("As Mr. Justice Holmes recognized, the
determination of legislative facts does not necessarily implicate
the same considerations as does the determination of adjudicative
facts."). 
B. Legislative Functions
In Friedman v. Rogers, 440 U.S. 1 (1979), the Supreme
Court considered a challenge to a statute establishing the Texas
Optometry Board. Like the Commission, the Board was comprised of
a pre-determined number of industry representatives. Four of the
six members were so-called "professional opticians," and the
remaining two slots were available to be filled by "commercial
opticians." See id. at 6. The plaintiff, a commercial optician,
challenged the regulation of his profession by a board whose
membership (professional opticians) stood to gain directly by
placing onerous restrictions on practice by their competitors. The
Court rejected this claim, stating: "Although Rogers has no
constitutional right to be regulated by a Board that is sympathetic
to the commercial practice of optometry, he does have a
constitutional right to a fair and impartial hearing in any
disciplinary proceeding conducted against him by the Board." Id.
at 18. Finding the latter right not implicated, the Court upheld
the statute.
Industry representation on regulatory boards is a common
and accepted practice. See id. at 18 (upholding such a scheme); 
Stivers v. Pierce, 71 F.3d 732, 743 (9th Cir. 1995) ("[T]he system
of industry representation on governing or licensing bodies is an
accepted practice throughout the nation."); Abramson v. Gonzalez,
949 F.2d 1567, 1579 (11th Cir. 1992). 
Friedman involved a statutory scheme that posed a far
greater danger to due process than the one we are faced with here. 
In that case, a "schism," Friedman, 440 U.S. at 5, had arisen
between commercial and professional opticians, and the professional
opticians were, under the statutory scheme at issue, given
significant power over their occupational rivals, see id. at 3-6. 
Despite this, the Supreme Court found no violation of the Due
Process Clause. Accordingly, we are unable to hold that the
composition of the Commission, without more, violates due process
by allowing handlers and processors from Compact states to
participate in the regulatory process. Not only has the Supreme
Court approved a more problematic regulatory regime in Friedman,
but we are not convinced that, given the significant attenuation of
the commissioners' potential financial gain, their interest rises
to the level of substantiality required by Tumey and its progeny. 
C. Adjudicative Functions
The Due Process Clause inquiry is slightly more
complicated with respect to the Hearing Panel. This is not, in
contrast to the issuance of regulations, a mere legislative
function. The Hearing Panel sits as a quasi-judicial adjudicative
body, and thus must comport with a higher standard of due process. 
The Hearing Panel meets this standard for four reasons. 
First, any potential financial interest on the part of individual
panel members is highly attenuated. See Aetna Life Ins. Co., 475
U.S. at 825 ("slight pecuniary interest" on the part of the
adjudicator does not violate due process). In order to "lead him
not to hold the balance nice, clear and true[,]" Ward, 409 U.S. at
60, a panel member would have to be swayed by his own pro rata
share in the additional profits (assuming that there are any) of a
relatively tiny proportion of the Compact milk receipts. Partially
regulated plants actually ship precious little milk into the
region. See Compact Over-Order Price Regulation, 62 Fed. Reg.
23,039 (April 28, 1997) ("At present, approximately 98 percent of
the fluid milk products consumed in the region are produced by
fluid processing plants located in New England."). See also Joint
Appendix at 160; In re Petitions of Crowley Foods, Inc. Stewart's
Processing Corp., Farmland Dairies, Inc., and Cumberland Farms,
Inc., Nos. HEP-97-001, 002, 004, and 005, Final Decision of the
Commission at 2, 5 ("Petitioners, in aggregate, supply
approximately three percent of all packaged, Class I, fluid milk
sales in the regulated area of the six New England states."). 
The Ninth Circuit has commented on an arguably analogous
situation. The court stated:
A lawyer in a one-lawyer town, for example, would
probably have a "direct" and "substantial" pecuniary
interest in the licensing of a competitor planning to
hang a shingle across the street. On the other hand, it
is unlikely that any attorney practicing in a city like
Los Angeles would have a competitive interest
sufficiently strong to require that he be disqualified
from considering the licensing of an additional lawyer.

Stivers, 71 F.3d at 743. We agree with the Ninth Circuit that at
some level of attenuation, as here, the adjudicator's interest
becomes too remote to have a constitutionally deficient effect. 
Second, the Commission's own regulations provide a due
process safeguard, placing stringent restrictions on the
composition of hearing panels. The regulations state: 
(a) Appointment of Commission hearing panel. Upon
receipt of a petition, the Chair shall appoint from one
to three Commission members who shall consider the
petition . . . . The Commission panel chosen by the
Chair shall consist of Commission members who are not
members of the state delegation in which the Handler is
incorporated or has its principal place of business, who
have no pecuniary interest in the outcome, and who are
otherwise fair and impartial.

Conduct of Proceedings, 7 C.F.R. 1381.4(a). Pursuant to this,
the Hearing Panel which heard appellants' petitions before the
Commission did not include any handlers or farmers. As noted
above, the Hearing Panel in this case consisted of the Commission
Chair, who was also the consumer representative from the Maine
delegation, the Chief of the Consumer Protection Division of the
Rhode Island Attorney General's Office, and the consumer
representative from the New Hampshire delegation. See New York
State Dairy Foods, Inc., 26 F. Supp. 2d at 258. Given the
composition of the Hearing Panel in this case, it will take more
than bare allegations to give rise to a finding of a deprivation of
due process. We recognize that the composition of the hearing
panel does not fully answer appellants' complaint about the
composition of the Commission as a whole. It is true that handlers
and producers sit on the Commission, and as a result both issue
initial regulations and pass on the Hearing Panel's proposed
decisions. The issuance of regulations, as we have said, involves
a lower due process bar. With respect to the final decision on the
Hearing Panel's proposed decision, however, we need do little more
than note that the full Commission adopted the proposed decision of
this (unquestionably, we believe) disinterested panel. 
Third, the Commission members vote as state delegations,
not individual members. We recognize that this alone cannot cure
a due process violation. See Cinderella Career & Finishing Sch.,
Inc. v. FTC, 425 F.2d 583, 592 (D.C. Cir. 1970) (one biased member
of even a sizable tribunal violates due process). It is not,
however, without relevance. The possibility that the small number
of handlers (with their already attenuated interest) on the
Commission will influence their peers sufficiently to alter a vote
is significantly more remote that it would be in a scheme in which
each commissioner voted individually.
Fourth, and perhaps most important, the appellants could
have moved to disqualify all handlers and farmers from the
Commission decision on their petitions. See 7 C.F.R.
1381.4(h)(3) ("Any commissioner shall (on either the
Commissioner's own motion or on motion of the petitioner)
disqualify himself or herself from consideration of the
Commission's final ruling on the panel's decision if that
commissioner's impartiality might reasonably be questioned."). 
They did not do so.
Accordingly, there is no legal or factual basis for
finding a due process violation. 
VI. CONCLUSION
Finding that the Commission violated neither the Commerce
Clause nor the Due Process Clauses, we affirm the district court's
entry of summary judgment. 

- Addendum Follows -